## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **JOHN W. STONE DISTRIBUTOR, LLC,** *et al* | * | **CIVIL ACTION NO. 17-4942** |
| **Plaintiffs** | * | **C/W 17-5700** |
| | * | |
| **VERSUS** | * | **JUDGE ASHE** |
| | * | |
| **PENN MARITIME, INC.,** *et al* | * | **MAGISTRATE NORTH** |
| **In Rem Defendants** | * | |

_____/

### OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

MAY IT PLEASE THE COURT:

On October 24, 2018 Defendant/ Cross Defendant Penn Maritime, Inc. ("Penn")

filed a motion for partial summary judgment seeking to dismiss Bisso Towboat Co., Inc.'s

("Bisso") cross claim for defense and indemnity pursuant to the terms of a "Tariff/

Towage Contract" and its associated "Rates, Terms, and Conditions."  Because, as is

more fully discussed below, the Tariff/ Towage Contract with its rates, terms, and

conditions is a valid maritime contract and is not void by the <u>Bisso</u> doctrine, the contract,

including the defense, indemnity, and insurance obligations, is binding on Penn.

### Background

Bisso's business relationship with Penn goes back at least to early 2013 when

Charles "Chuck" Ferrer of Kirby Offshore Marine ("Kirby") contacted Bisso's president,

Scott Slatten, and asked to meet with him about starting a business relationship with

Bisso.[1]  Penn is the wholly owned subsidiary of Kirby, and Kirby executives negotiated

on behalf of Penn. On May 8, 2013, Slatten met with Ferrer at Kirby's offices in Houston

---

[1] Exhibit A

1

to discuss Bisso's rates and terms.[2]   At that meeting, Slatten informed Ferrer of Bisso's current rates, as set forth in Bisso's "tariff" at the time.  The rates set forth on Bisso's tariff's are the starting point for negotiations.[3]   That is, the rates printed on the tariff are the rates charged in the absence of another negotiated agreement. Slatten and Ferrer negotiated that Bisso tugs would be available to assist Kirby/ Penn Articulated Tug and Barge units (ATBs) operating in the Mississippi River at an agreed rate of $550 per hour.

Two days later, on May 10, 2013, Bisso tugs began assisting all Kirby/ Penn ATBs on the river.  Since that time, Bisso has been the exclusive provider of assist tug services to Kirby/ Penn on the Mississippi River.[4] However, there are other vessel operators in this area who offer the same or similar services a Bisso, and Kirby/ Penn is free to use the services of those companies. Further, up until the time he left the employment of Kirby, Ferrer was the person with whom Slatten negotiated Bisso's contracts and rates.[5]

The mutually beneficial business relationship continued under the same terms and rates until February 11, 2014 when Slatten and Ferrer again met in Kirby's Houston office to discuss general business.  By Email dated June 16, 2014, Ferrer agreed to a rate increase to $825/ hour for Bisso tugs working in the Empire/ Ostrica area of the Mississippi River.[6]  The rate of $550/ hour remained the same for other areas of the river.

---

[2] Exhibit A.

[3] Exhibit A.

[4] Exhibit A.

[5] Exhibit A.

[6] Exhibit A.

On September 23, 2014, Slatten and Ferrer met again and generally discussed the business relationship. About six months later, on February 26, 2015, Bisso sent an email to its customers including Chuck Ferrer and William Block of Kirby, advising them that a new tariff with increased rates was forthcoming.[7]  Then, on March 19, 2015, Bisso sent all its customers, including Chuck Ferrer and William "Billy" Block of Kirby, an email informing them of an upcoming rate increase and Bisso's new Tariff.[8]  The rate increase and new Tariff were set to become effective on April 1, 2015.  Notably, a copy of the Tariff with the incorporated Towage Contract and Rates, Terms, and Conditions was attached to the email.[9]  Slatten then negotiated rates with all Bisso's customers, using the stated rates on the Tariff/ Towage Contract as a starting point for negotiations, although only perhaps 20% of the customers actually signed the contract.[10]

Not only was the new Tariff/ Towage Contract disseminated by email in March 2015, Slatten personally met with Ferrer on May 5, 2015 and physically handed him a copy of the new Tariff/ Towage Contract.  Billy Block was not at that meeting. Ferrer acknowledged that he had already received the new contract via email.[11]  At that same meeting, Ferrer, on behalf of Kirby, agreed to the new Tariff/ Contract and to an

---

[7] Exhibit A and Exhibit 1 attached thereto.

[8] Exhibit A and Exhibit 2 attached thereto.

[9] Exhibit A and Exhibit 3 attached thereto.

[10] Exhibit A.

[11] Exhibit A.

increased rate of $600/ hour for Bisso tugs.[12]  However, Ferrer requested that the new rate

not go into effect until June 1, 2015.[13]  Kirby/ Penn, through Ferrer, accepted the Tariff/

Towage Contract and rate increase, and the business relationship between Kirby/ Penn

and Bisso continued.  In fact, on October 13, 2015, Slatten again met with Ferrer and also

with William "Billy" Block in Houston, and neither of those gentlemen expressed any

dissatisfaction with the Tariff/ Towage Contract.[14]

Three months later, on January 15, 2016, Kirby requested that Bisso provide a tug

to assist the ATB LUCIA/ CARIBBEAN in undocking and turning around in the river. In

response, Bisso dispatched the WILLIAM S, a twin Z-drive tractor tug.[15]  A tractor tug,

such as the WILLIAM S, is primarily used, and particularly suited to, assisting in docking

and undocking maneuvers, as opposed to traditional towing, because those vessels have

greater maneuverability than most tugs, particularly tractor tugs with a Z-drive propulsion

system like the WILLIAM S.[16]  Because of this desired increased maneuverability, tractor

tugs are able to charge a higher rate.[17]

---

[12] Exhibit A.

[13] Exhibit A.

[14] Exhibit A.

[15] Exhibit A.

[16] Dixie Marine, Inc. v. Q JAKE, 2017 WL 3600574 p.4 (E.D. La. 08/22/2017)(Barbier, J.); Bay & Delta Tractor Tug Co. v. Barge PACIFIC TRADER, 1997 WL 797935 p. 3, 5 (N.D. Cal. 12/16/1997)(Legge, J).

[17] Bay & Delta Tractor Tug, 1997 WL 797935 at p. 4 [Because of the use of the tractor tug, the tug company could charge a higher rate than it normally charged the same customer.].

The WILLIAM S arrived at the ABT LUCIA/ CARIBBEAN's location at approximately 11:00 p.m. on January 14, 2015.[18]  The Mississippi River at that time was experiencing high water conditions and a fast current. The LUCIA was fully manned and operating under its own power with her chief mate at the controls and under the command of its master and a federal river pilot.[19]  The pilot was assisting the navigating maneuvers for the turn in the river and giving orders to the WILLIAM S.[20]

Around 11:45 p.m., the WILLIAM S, with mate Tony Cutrer at the controls, moored on the starboard side of the loaded CARIBBEAN at a location designated by the LUCIA's chief mate.[21]  Initially, Cutrer had concerns about "fendering" between the two vessels so that metal-to-metal contact between the vessels could be avoided.[22]  (Metal-to-metal contact could cause a spark which could ignite the petroleum product aboard the CARIBBEAN). Assured by the LUCIA's deck hand that the "fendering" was adequate, Cutrer executed the first order by the LUCIA's operator to assist the ABT LUCIA/

---

[18] Exhibit B (Deposition of Tony Cutrer, page 135, lines 17-19; page 140, lines 19-22).

[19] Exhibit C (Deposition of Henry Costner, page 24, lines 8-16; page 25, lines 18-25): Exhibit D (Deposition of Noah Blanchard, page 41, lines 20-25; page 42, lines 1-5, 23-25, page 43, lines 1-5).

[20] Exhibit D (Deposition of Noah Blanchard, page 43, lines 9-23; page 52, lines 8-10, 13-14.).

[21] Exhibit B (Deposition of Tony Cutrer, page 137, lines 12-16); Exhibit C (Deposition of Henry Costner, page 69, lines 3-12); Exhibit D (Deposition of Noah Blanchard, page 58, lines 3-10, page 180, lines 19-25; page 181, lines 1-4).

[22] Exhibit B (Deposition of Tony Cutrer, page 136, lines 7-11; page 138, lines 12-23; page 139, llines 7-10); Exhibit C (Deposition of Henry Costner, page 53, lines 23-25; page 59, lines 21-25; page 60, lines 1-5; page 272, lines 7-25); Exhibit D (Deposition of Noah Blanchard, page 70, lines 4-8; page 72, lines 1-7; page 181, lines 9-20; page 183, lines 1-13) .

CARIBBEAN in moving off the dock.[23] It is undisputed that the undocking maneuver was successful.[24] Once the mooring lines were released, the ATB, with the WILLIAM S along the starboard side, departed the dock and headed upriver to make a turn around. Around twelve minutes past midnight, the turning maneuver began, and Cutrer received an order from the LUCIA to push "hard straight in."[25] Cutrer began increasing the WILLIAM S's engines but, at 40% power, he encountered a strong river current of 6 to 7 miles per hour which caused the vessel to "roll and lift up."[26] Concerned about inadequate fendering and fearing metal-to-metal contact between the vessels, Cutrer immediately radioed the LUCIA and stated that he did not feel comfortable giving more than 40% power.[27] However, LUCIA deck hands aboard the CARIBBEAN advised that there was a space of a foot between the vessels so Cutrer immediately increased the engines to 100%.[28] Importantly, only one minute or so elapsed between the order for the

---

[23] Exhibit B (Deposition of Tony Cutrer page 140, lines 19-22; page 141, lines 1-3); Exhibit C (Deposition of Henry Costner, page 54, lines 3-4).

[24] Exhibit C (Deposition of Henry Costner, page 86, lines 9-13); Exhibit D (Deposition of Noah Blanchard, page 184, lines 3-20).

[25] Exhibit B (Deposition of Tony Cutrer, page 151, lines 19-25; page 152, lines 1-8; page 153, lines 12-21; page 154, lines 1-24; page 155, lines 1-9; page 201, lines 8-11); Exhibit C (Deposition of Henry Costner, page 16, lines 20-25, page 17, lines 1); Exhibit D (Deposition of Noah Blanchard, page 72, lines 8-17; page 185, lines 18-25; page 186, lines 1-4).

[26] Exhibit B (Deposition of Tony Cutrer, page 231, lines 11-25; page 232; lines 1; page 234, lines 1-7, 13-23); Exhibit C (Deposition of Henry Costner, page 116, lines 23-25; page 117, lines 1-6; page 122, lines 20-25; page 123, lines 1); Exhibit D (Deposition of Noah Blanchard, page 153, lines 6-14).

[27] Exhibit B (Deposition of Tony Cutrer); Exhibit C (Deposition of Henry Costner).

[28] Exhibit B (Deposition of Tony Cutrer, page 156, lines 13-25; page 157, lines 1-11, 16-17, 19-25; page 158, lines 1-12); Exhibit C (Deposition of Henry Costner, page 124, lines 11-

WILLIAM S to "push hard straight in" and the increase of the engines to full power.[29]

However, the LUCIA's chief mate changed the gear of the starboard propeller from

reverse to forward in what he thought was an effort to stop the ATB from being pushed

too far across the river.[30]  Unfortunately, this had the effect of stopping the reverse thrust

of the ATB, and the unit continued to move across the river.[31]  This, combined with other

errors on the part of those in command of the LUCIA, caused the ATB to be out of

position for the turn.[32]

A short time later, the CARIBBEAN allided with the barges moored at the John

W. Stone Oil Distributor dock.  This litigation ensued, including Bisso's cross claim for

defense and indemnity under the terms of the Tariff/ Towage Contract.  However, despite

the litigation and cross claim, Bisso and Kirby/ Penn continue to do business under the

terms of the Tariff/ Towage Contract.  In fact, Bisso assists Kirby/ Penn vessels

approximately 50 times a month.[33] Not only that, in 2017 Kirby/ Penn agreed to a rate

---

18); Exhibit D (Deposition of Noah Blanchard, page 72, lines 18-25; page 73, lines 3-6).

[29] Exhibit B (Deposition of Tony Cutrer, page 152, lines 9-18; page 156, lines 5-8).

[30] Exhibit C (Deposition of Henry Costner, page 134, lines 7-15; page 137, lines 10-19).

[31] Exhibit C (Deposition of Henry Costner, page 142, lines 7-13).

[32] The WILLIAM S should have been instructed to tie up to the CARIBBEAN at a point closer to the bow; the ABT should have started the turn closer to the east bank of the river; the LUCIA should have noticed the outer most barge at the Stone facility; the LUCIA's mate should have monitored his VRM which would have showed the ABT's stern was moving too far in the river; the LUCIA utilized a "twin screw" maneuver which prevented effective backing of the ABT; and the LUCIA should have aborted the turn when alerted to the "fendering" issue with the WILLIAM S.

[33] Exhibit A.

7

increase to $800/ hour for conventional tugs and to $900/ hour for tractor tugs, such as the WILLIAM S, in response to Bisso's need to increase its tariff rates to accommodate the increased demand for tractor tugs by Kirby/ Penn.[34]  Thus, it is "business as usual" between the companies despite Kirby/ Penn's undisputed knowledge of the terms of the Tariff/ Contract.

## Law and Argument

### The Tariff/ Towage Contract Is Binding

Penn admits that two of its executives received a copy of the Tariff/ Towage Contract by email on March 19, 2015.[35]  Plainly, the subject line of the email states "Bisso Towboat Tariff - April 1, 2015."  On the recipient line for "cc" the names "Kirby - Billy Block" and "Kirby - Chuck Ferrer" are clearly visible.  The attached file name reads "Bisso Towboat Tariff - Effective April 1, 2015."  The text of the email states that the "Towage Contract/ Tariff" is attached.

No one at Kirby/ Penn denies receiving this email.  To the contrary, Chuck Ferrer verbally acknowledge receiving it. Further, Ferrer personally received a hard copy of the Tariff/ Towage Contract on May 5, 2015 and the same was discussed with him by Bisso's president, Scott Slatten at that time.[36]  Ferrer accepted the Towage Contract/ Tariff and

---

[34] Exhibit A.

[35] R.Doc. 63-1, page 3, 4; The email is attached hereto to Exhibit A as Exhibit 2.

[36] Exhibit A.

the parties continued to do business.[37]

The attachment to the email was the Tariff/ Towage Contract (with attached Rates, Terms, and Conditions) which is the subject of Bisso's cross claim and Penn's motion for partial summary judgment.  The contract is attached hereto as Exhibit A/ Exhibit 3 and will not be repeated here *verbatim*, although a brief description is necessary. The entire contract consists of four pages.  The first page is divided in two parts: the first part is captioned "Tariff Effective - April 1, 2015" and has a list of Bisso's vessels, Bisso's address and phone numbers, and the Bisso website.  The second page is a map of the Mississippi River between the Southwest Pass and Baton Rouge.  The third and fourth pages contain rates and charges and the terms and conditions.  Notably, this type of "tariff" or contract is customary in the tug industry.[38]

Pertinent to this discussion, there are several important things to note concerning Penn's knowledge of the contract's terms and conditions: the contract clearly provides the address for Bisso's website, www.bissotowing.com, on the first page; the contract references the included "Towage Contract - Rates, Terms, and Conditions"; the "Towage Contract - Rates, Terms, and Conditions" contains express and unequivocal defense, indemnity, and insurance clauses; the "Towage Contract - Rates, Terms, and Conditions" states:

These "Terms and Conditions" shall apply to all ship assist

---

[37] Exhibit A.

[38] In re Complaint of Moran Philadelphia, 175 F.Supp.3d 508, 512-513, 519-522 (E.D. Pa. 2016)[Discussing cases which concerned similar contracts].

towing, escort towing and general towing or tug services on the Mississippi River <u>for which no other express written contract signed by Bisso</u>, or any applicable Tariff of a terminal or elevator facility in favor of Bisso exists.  The ordering of any services provided by Bisso or the acceptance of any services provided by Bisso or on behalf of Bisso, constitutes the acceptance to all the "Terms and Conditions" and provisions stated herein and posted on Bisso Towboat's website <u>www.bissotowing.com</u> at the time such services are ordered, verbally requested, or performed.  Updates to these "Terms and Conditions" may be made from time to time by posting updates to <u>www.bissotowing.com</u>. [emphasis supplied].

The contract clearly includes a reference to Bisso's website and incorporates the "terms and conditions" which, in turn, also incorporates the website which has the "terms and conditions" including the defense and indemnity provisions.  Even after Kirby/ Penn executives Ferrer and Block received the "Tariff/ Towing Contract" and the "Rates, Terms, and Conditions," Penn continued to request and accept the services of Bisso, thus, accepting the explicit terms and conditions of the contract.

Despite the fact that Kirby/ Penn undisputably received the "Tariff/ Towing Contract," and the terms and conditions and reference to the website are plain to see, Penn attempts to say that it is not bound by the contract's terms such as the defense and indemnity provisions.  First, Penn argues that the  "Tariff/ Towing Contract" is not really a tariff and, so the argument goes, it had to have been filed with the Federal Maritime Commission in order for Bisso to be able to enforce the contract unless the other party explicitly agreed to its terms.  This is simply not supported by the case law.

Penn cites to <u>Bunge Corp. v. M/V MOUNT EDEN</u> in support of its position.[39] However, that case does not aid Penn. In <u>Bunge Corp.</u>, a dock facility sought to enforce the liquidated damages clause in its "tariff." The district court noted that the "tariff," which was incorporated by reference in an application for a dock berth, was not a "mandatory tariff" that has to be filed with the Federal Maritime Commission. Nonetheless, the "tariff" was enforceable, just as any maritime contract, if the ship or the ship's agent consented to its terms.[40] Because the ship's agent undisputably received the berth application which incorporated the "tariff" by reference, the court held that the ship was bound by the "tariff's" terms, even though the agent had not read the tariff and was not familiar with its terms. However, despite the fact that the "tariff" was valid and binding, the court ultimately held that the dock facility waived the "tariff's" liquidated damages clause by not ordering the vessel to move from its berth.[41] Thus, the <u>MOUNT EDEN</u> case stands for the proposition that a "tariff" need not be filed with the Federal Maritime Commission to be binding on the party accepting it, even though the "tariff" is incorporated by reference in another document.

Here, Bisso does not contend that its "Tariff/ Towage Contract" was the type of "mandatory tariff" that needed to be filed with either the Federal Maritime Commission or the Surface Transportation Board. The term "tariff" and "schedule of rates, terms, and

---

[39] 1983 WL 591 (E.D. La. 08/16/1983).

[40] <u>Id</u> at p. 1.

[41] <u>M/V MOUNT EDEN</u>, 1983 WL 591 p. 2.

conditions" are often used interchangeably in the tug industry.[42]  What Bisso contends is that Chuck Ferrer (and Billy Block) undisputably received the "Tariff/ Towage Contract" (with the incorporated defense and indemnity provisions) by email, Ferrer personally received the contract and verbally accepted it, the contract plainly states that its terms and conditions apply in the absence of another express written contract, that the ordering of, or acceptance of, services by Bisso constitutes acceptance of the terms and conditions of the contract, and that Kirby/ Penn continued to request and accept the services of Bisso after they undisputably received the "Tariff/ Towage Contract."  Therefore, pursuant to MOUNT EDEN and other cases to be discussed below, the terms of the "Tariff/ Towage Contract" are binding on Kirby/ Penn.

Contrary to Penn's position, it is not necessary that Kirby or Penn sign the contract for its terms to be enforceable.  As a general contract principle, "The manifestation of assent may be made wholly or partly by written or spoken words or other acts for by failure to act."[43]  Here, Kirby/ Penn received the "Tariff/ Towage Contract" both by email (through Ferrer and Block) and in person (through Ferrer), Ferrer verbally accepted the terms of the contract after discussing it with Bisso's Slatten, the contract is customary in the industry, and Penn continued to request and accept Bisso's services after receiving the contract.

Support for Bisso's position that Penn is bound by the terms and conditions of the

---

[42] Complaint of Moran Philadelphia, 175 F.Supp.3d 508, 522, n. 11 (E.D. Pa. 2016).

[43] Restatement (Second) of Contracts, §19(1) (1981).

"Tariff/ Towage Contract" is found in <u>Trinidad Corp. v. S.S. Sister Katingo</u>.[44]  In that case, Moran Towing & Transportation Company, Inc. had a Rate Schedule which included a "pilotage clause" that disclaimed liability for acts of one of Moran's employees acting as a vessel pilot.  The owners of the SISTER KATINGO orally requested by telephone that Moran provide two tugs to assist the vessel in an undocking maneuver.[45]  The terms and conditions of the Rate Schedule were not discussed at the time.  After the vessel collided with another vessel during the maneuver, the vessel's owner's sued Moran who invoked the "pilotage clause" in its Rate Schedule. Even though there was not a signed, written contract with the exculpatory clause, the district court held that the "pilotage clause" was incorporated into the oral contract for the tug services.[46]  In support of its decision, the district court observed that the vessel owner's executives had been given copies of the Rate Schedule in the past, had prior dealings with Moran, and were familiar with the customs of the tug industry.[47]

The United States Court of Appeal for the Second Circuit reached a similar conclusion in <u>The Margaret A. Moran</u>.[48]  In that case, a vessel owner requested by a telephone call that  Moran Towing & Transportation provide a tug to tow its vessel. Unfortunately, during the tow, the vessel hit a pier causing damage to the vessel. In the

_____

[44] 280 F.Supp. 976 (S.D. NY 1967).

[45] <u>Trinidad Corp.</u>, 280 F.Supp. at 977.

[46] <u>Id</u> at 977.

[47] <u>Id</u>.

[48] 57 F.2d 143 (2d Cir. 1937).

times before internet and email, Moran Towing & Transportation had sent a copy of its schedule of rates with a pilotage clause to the vessel owner on at least three occasions in the two years prior to the incident subject of the litigation.  In holding that the exculpatory pilotage clause applied, the Second Circuit stated "The record sufficiently sustains the contention that the terms of this contract were called to the attention of [the vessel owner]"[49] and further noted, *inter alia*,  that after the schedule of rates was disseminated to the vessel owners, the vessel owners had used Moran's services over 42 times in a two year period and there was no evidence that the vessel owners objected to the schedule, or that a different contract had been entered into, and the schedule was in general use in the area.[50]

Similarly, in Complaint of Moran Philadelphia, Moran Towing & Transportation had a long standing business relationship with Rhoads Industries, Inc.[51]  Similar to Bisso, Moran sent a mass email to its customers and attached a copy of Moran's "Schedule of Rates, Terms, and Conditions."[52]  Only a small percentage of the customers returned a signed contract but Moran continued to provide towing services to them.[53]  In addition to the emailed Schedule, Moran's invoices sent after a job contained a reference to Moran's rates, terms, and conditions published on its website. In addition to the reference on the

---

[49] The Margaret A. Moran, 57 F.2d at 144.

[50] Id.

[51] 175 F.Supp.3d 508 (E.D. Pa. 2016).

[52] Id at 513.

[53] Id at 514.

invoices, on October 29, 2012, Moran's vice president sent an email to Rhoads vice

president which included the Schedule as an attachment. About a week later, Rhoads

telephone Moran and asked that Moran provide a tug to shift a crane barge within the

Philadelphia Naval Shipyard.[54]  During the shift, a section of the crane boom contacted

the overhanging antenna platform of the USS JOHN FITZGERALD KENNEDY. Moran

did not send Rhoads an invoice for the services.

The district court held that Rhoads had both actual (from inclusion in the email

sent directly to Rhoads) and constructive knowledge of the Schedule (from reference in

the invoices) and that "a signed agreement or specific discussion of the Schedule was not

necessary under the circumstances to bind Rhoads to its terms and conditions".[55]  The

court found it particularly important that Moran's website containing the Schedule was

conspicuously listed into other documents previously sent to Rhoads and that the

Schedule on the website was easy to access.[56]

The district court gave short shrift to Rhoads's arguments that the executive that

ordered the tug services was only responsible for "operations and rates" but was not

responsible for the "legalities" of the Schedule as that was the responsibility of the legal

department.[57]  Rather, the fact that Rhoads never objected to the Schedule after being

---

[54] <u>Moran Philadelphia</u>, 175 F.Supp.3d at 514.

[55] <u>Id</u> at 523.

[56] <u>Id</u> at 511-512, 513

[57] <u>Id</u> at 513.

made aware of its existence was considered by the court to be an assent to its terms and conditions.[58]

Further, it was not dispositive to the application and enforceability of the Schedule that Rhoads executives never read it. The requisite "meeting of the minds" was accomplished when Rhoads requested tug services with knowledge of the existence of the Schedule. The district court cited an apt quote from the Second Circuit in <u>Sun Oil Co. v. Dalzell Towing Co.</u>:

> Whether he had actually read the clause and whether it was in his mind when he telephoned the order for tugs for the [steamship] is quite beside the point. The meeting of the minds of a party to a contract is not determined by a subjective test. [The] offer on behalf of the libellant, which the respondent accepted, must be interpreted in the sense in which the party using the words should reasonably apprehend that they would be understood by the other party. [internal citation omitted]. Knowing that the respondent had a schedule of rates and a pilotage clause, the importance of which had been stressed not only in the letter of November 15, 1923, but also printed on its billheads, the libellant should reasonably apprehend that its telephone order for tugs would be understood by respondent as a request that they be furnished upon its customary terms as to rates and pilotage.[59]

Based on <u>Sun Oil</u> and other cases, including <u>One Beacon Ins. Co. v. Crowley Marine</u>, discussed below, the district court held that Rhoads was bound by the Schedule as disseminated and posted on the website, even if its executives never actually read it.[60]

---

[58] <u>Moran Philadelphia</u>, 175 F.Supp.3d at 523.

[59] <u>Id</u> at 525 *citing* <u>Sun Oil Co. v. Dalzell Towing Co.</u>, 55 F.2d 63, 64-65 (2d Cir. 1932).

[60] <u>Id</u> at 525.

Here, Kirby/ Penn actually received a copy of the "Tariff/ Towage Contract" with its rates, terms, and conditions.  In addition, the hard copy of the contract contained an explicit reference to Bisso's website which also contained the terms and conditions, including the all important defense, indemnity, and insurance clauses.   The contract on the website is easy to access.  One need only go to www.bissotowing.com and click on "tariff" on the right hand side of the top menu bar.  The "Tariff/ Towage Contract" in its entirety immediately pops up.  Thus, as set forth by the cases discussed above, given Kirby/ Penn's actual and constructive knowledge of the "Tariff/ Towage Contract," it is not necessary that Kirby/ Penn actually signed the contract; or that Ferrer or Block were in the Sales Department as opposed to the Legal Department, or that allegedly no one from Kirby/ Penn actually read it.  To paraphrase the Second Circuit,

> Knowing that the [Bisso] had a schedule of rates and an [indemnity] clause, the importance of which had been stressed not only in the [email] of [March 29, 2015], but also printed on its [website], [Kirby/ Penn] should reasonably apprehend that its telephone order for tugs would be understood by [Bisso] as a request that they be furnished upon its customary terms as to rates and [terms and conditions].[61]

In summary, the terms of the "Tariff/ Towage Contract" are binding on Penn.

Further support for Bisso's position is found in the U.S. Fifth Circuit case of <u>One Beacon Ins. Co. v. Crowley Marine Services, Inc.</u>[62]  In that case, Crowley Marine requested defense, indemnity, and insurance coverage from Tubal-Cain Marine Services

---

[61] <u>Sun Oil</u>, 55 F.2d at 64-65.

[62] 648 F.3d 258 (5th Cir. 2011).

in relation to a personal injury lawsuit by the employee of one of Tubal-Cain's subcontractors.  The defense, indemnity, and insurance provisions were contained on Crowley Marine's website and the website was referenced in repair service orders ("RSO") sent to Tubal-Cain prior to a project.  The RSOs did not contain prices and were not signed by either party.[63]  It was undisputed that Crowley did not provide a hard copy of the terms and conditions, including the defense and indemnity provisions, and that Crowley did not discuss the terms and conditions with Tubal-Cain when the pertinent RSO was issued.[64]  Further, the web site containing the terms and conditions was not particularly "user friendly."

   Nonetheless, the Fifth Circuit held that the terms and conditions posted on the website, which were incorporated into the RSOs, were binding on Tubal-Cain.[65]  In doing so, the Court rejected Tubal-Cain's arguments that it did not receive a hard copy of the terms and conditions, the web site was difficult to navigate, or that its executives never actually read the document on the web site because they did not think it was part of the contract. The Court reiterated the general rule, that where a contract expressly refers to and incorporates another instrument in specific terms which show a clear intent to incorporate that instrument into a contract, both instruments are to be construed

---

[63] 648 F.3d at 263.

[64] Id at 264.

[65] See also Cargill v. Kopalnia Rydultowy Motor, 304 Fed.Appx. 278, 282 (5th Cir. 2008).

together.[66]  The Court further stated, "We see no reason to deviate from these principles

where, as here, the terms to be incorporated are contained on the party's website."[67]

In the instant case, Bisso's position is stronger than that of Crowley Marine

because the "Tariff/ Towage Contract" was actually provided to Kirby/ Penn.  If that were

not enough, the "Tariff/ Towage Contract" explicitly referenced Bisso's easily navigated

website which also contained the contract and the defense, indemnity, and insurance

provisions.  Thus, per the precedent of the Fifth Circuit, the terms and conditions of

Bisso's contract are binding on Kirby/ Penn.

**The "Bisso" Doctrine Does Not Apply**

Penn contends that the rule announced by the U.S. Supreme Court in Bisso v.

Inland Waterways Corp. voids the defense and indemnity provisions in the "Tariff/

Towage Contract."[68]  However, that rule is inapplicable to the facts at hand.

In Bisso, Inland Waterways's barge was being towed in the Mississippi River by a

towboat owned by Bisso Towboat Co.  The barge, which had no motive power, no

steering apparatus, and no crew, was towed by the towboat into a bridge pier.[69]  The

underlying towage contract contained two clauses which, in effect, relieved the towboat

owner from liability for its own negligence.   In holding that the exculpatory clauses

---

[66] 648 F.3d at 267.

[67] Id at 268.

[68] 349 U.S. 85 (1955).

[69] Id at 86.

could not be upheld, the Court likened a towage contract to that of a bailment and noted that bailment, and similar contracts, did not allow "release-from-negligence" clauses for two main reasons: (1) to discourage negligence by making the wrongdoers pay damages; and (2) to protect those in need of goods and services from being overreached by others who have power to drive a hard bargain.[70]  The second consideration is generally considered the most important to the rationale of the <u>Bisso</u> rule.  This is supported by the fact that the Court further noted that "vessels in American ports [should] be able to obtain towage free of monopolistic compulsions."[71]  Importantly, in this case, Bisso does not have a monopoly on assist tug services.[72]

It is generally held that Bisso applies only to towage contracts.[73]  A contract whereby the owner of a tug or tow boat agrees to expedite the movement of a barge lacking motive power is a contract of towage.[74]  Subsequent courts in deciding whether to apply <u>Bisso</u> have refused to formulaically apply the prohibition against exculpatory clauses based on the label attached to the contract at issue.  Instead, courts analyze whether the contract at issue is a true towage contract in which the tug has complete

---

[70] <u>Bisso</u>, 349 U.S. at 90-91.

[71] <u>Id</u> at 91.

[72] Exhibit A.

[73] <u>Sanders v. Alexander Richardson Investments</u>, 334 F.3d 712, 717 (8th Cir. 2003); <u>Morton v. Zidell Explorations, Inc.</u>, 695 F.2d 347, 350 (9th Cir. 1982).

[74] Admiralty in a Nutshell, page 118 (2nd Ed.1983).

control of the tow.[75]   Thus, simply because the contract at issue in this case is labeled

"Tariff/ Towing Contract" does not mean that the Bisso rule automatically applies.

In fact, the contract here between Bisso and Kirby/ Penn is not a towage contract

in the traditional sense.  As one court stated, "towage contracts [as contemplated by the

Bisso rule] involve services in which a tug is in sole control because the tow is without

power or crew."[76]  Here, Bisso was not tasked with towing an unmanned, dumb barge, as

was the situation in the Bisso case.  Rather, Bisso supplied the tractor tug WILLIAM S to

act as an assist tug to help the ATB LUCIA/ CARIBBEAN in undocking and turning

around in the river.  The ATB was in command of the maneuver, was under its own

power, had full steering capability, and had a full crew, including a chief mate at the conn

and her master and a federal river pilot in the wheelhouse.  The ATB was clearly the

"dominant mind" in the operation.[77]  The fact that a tractor tug, whose function is to assist

in docking, undocking, and ship maneuvers, as opposed to conventional towing, was

specifically needed for this job, is evidence that the contract was not one of "towage."  As

---

[75] See Sander v. Alexander Richardson Investments, 334 F.3d 712 98th Cir. 2003)[The rule in Bisso is limited to towage agreements and similar contracts such as bailments.];  In re Wechsler, 121 F.Supp.2d 404, 434 (D. Del. 2000)[The party advancing the application of exculpatory clause was not exercising the type of "monopolistic power" that the Bisso court considered offensive.].

[76] Stevens Institute of Technology v. U.S., 396 F.Supp. 986, 990 (S.D. NY 1975). See also Hercules, Inc. v. Stevens Shipping Co., 695 F.2d 726, 737-738 (5th Cir. 1983)(en banc)(Before applying Bisso the court must decide whether the contract is one of towage or another type of contract.).

[77] The "dominant mind" doctrine provides that a vessel is liable if that vessel's crew is actually in control of the operation.  A tug is considered the "dominant mind" when it provides the motive power.  Chevron USA, Inc. v. Progress Marine, Inc., 1980 AMC 1637 (E.D. La. 1980) aff'd 632 F.2d 893 (5th Cir. 1980).

the assist tug, the WILLIAM S was charged with following the orders of the lead vessel, not controlling the movement.[78]

The two most recognized exceptions to the <u>Bisso</u> rule are those contracts for affreightment and for pilotage.  A contract for affreightment, also known as a contract for transportation, is one where the object of the contract is the movement of cargo or goods.[79] A contract for pilotage is one where an employee of another entity boards a vessel to direct her movements while the boarded vessel is still fully crewed and under her own power. Crucial to the distinction between those types of contracts and the ones for towage is the issue of who has control.  For example, Bisso does not apply to contracts of affreightment, because in those contracts, the vessel(s) carrying the goods control the entire means of transportation.  Thus, the owner/ shipper of the goods can enforce an exculpatory clause in the contract against the vessel owner.[80]

Further, <u>Bisso</u> only precludes application of clauses that seek to exclude the tower from all liability.  However, a clause which limits the types of damages for which the tower will be liable are not prohibited.[81]  Here, the indemnity provisions in the "Tariff/ Towage Contract" are not completely exculpatory. The assisted vessel, in this case the

---

[78] <u>Diesel Tanker Ira S. Bushey, Inc. v. Tug Bruce A. McAllister</u>, 1994 WL 320328 p.11-12 (S.D. NY 06/29/1994).

[79] <u>Sacramento Nav. Co. v. Salz</u>, 273 U.S. 326, 328 (1927).

[80] <u>Pure Oil Co. v. M/V Caribbean</u>, 235 F.Supp. 299, 305 (W.D. La. 1964).

[81] <u>Black Stallion Enterprises v. Bay & Ocean Marine, LLC</u>, 862 F.Supp.2d 534, 549 (E.D. La. 2012)[internal citations omitted]; <u>Foss Maritime v. Cashman Equipment</u>, 2008 WL 4534378 (E.D. La. 10/06/2008)(Africk, J)[Provision limiting liability in a towage contract for consequential losses did not run afoul of <u>Bisso</u>.].

ABT LUCIA/ CARIBBEAN, is only required to defend and indemnify Bisso in situations in which the casualty was not caused solely by the willful failure of the assisting tug's captain or crew to carry out the directions and orders of the assisted vessel.  The clause does not exculpate Bisso from its sole fault. Thus, the limitation of liability is not *per se* voided by the <u>Bisso</u> rule.

In addition, the <u>Bisso</u> prohibition against contracts which exculpate a tower from liability for their own negligence does not apply to invalidate a contract for insurance coverage.[82]  Compulsory insurance clauses are simply not considered "exculpatory" as that term is used in <u>Bisso</u>.[83]  The "Tariff/ Towage Contract" contains the following insurance clause:

> Owners and vessel warrant that they possess sufficient and adequate insurance on the vessels being assisted ... to respond for any losses arising out of or connected in any way with the tug services provided hereunder, with all rights of subrogation for losses under said insurances waived as to Bisso and with Bisso entitled to all benefits under said as an additional assured or co-assured, as applicable. ...

The insurance provisions in the contract do not have to be mutual in order to avoid the <u>Bisso</u> rule.[84] Thus, Bisso is entitled to receive the benefit of coverage and protection from Kirby/ Penn's insurers.

---

[82] <u>In re Gulf & Midlands Barge Lines, Inc.</u>, 509 F.2d 713, 723 (5th Cir. 1975); <u>Seley Barges, Inc. v. tug El Leon Grande</u>, 396 F.Supp. 1020, 1025 (E.D. La. 1974).

[83] <u>Twenty Grand Offshore, Inc. v. West India Carriers, Inc.</u>, 492 F.2d 679 (5th Cir. 1973).

[84] <u>BASF Wyandotte Corp. v. Tug Leander, Jr.</u>, 599 F.2d 96, 97 (5th Cir. 1979).

**The Actions of Bisso's Mate**

As explained in the Background section above, the WILLIAM S was under the control of its first mate, Tony Cutrer, at the time of the allision.  Several times throughout its memorandum in support, Penn states that the "defense/ indemnity provisions in Bisso seeks to enforce are voided by its failure to follow the instructions of Penn's vessel during the maneuver."[85]  However, Penn fails to provide any meaningful analysis to this claim. The portion of the indemnity provision to which Penn seems to be concerned with states:

> Owners and the assisted vessel ... shall defend, indemnify and hold harmless Bisso and the assisting tugs, ... from and against any and all claims ... liabilities and damages of any nature whatsoever ... and from any cause whatsoever, including the negligence of the assisting tug ... except to the extent such losses or damages are caused solely by the willful failure of the assisting tug's captain or crew members to carry out the directions and orders of the assisted vessel ...

However, it has yet to be determined (1) whether the actions of Cutrer in delaying one minute to go to full power because the WILLIAM S had ridden up on a wave and he was afraid of making contact with the CARIBBEAN was a "willful failure ... to carry out the directions and orders of the assisted vessel" and (2) whether such "willful failure" was the sole cause of the allision. Thus, Penn is not entitled to summary judgment on this point.

## Conclusion

First, Penn received, accepted, and assented to the "Tariff/ Towage Contract" with its incorporated "Rates, Terms and Conditions," including the defense, indemnity, and

---

[85] R.Doc. 63, R.Doc. 63-1, page 1, 10.

insurance clauses.  Second, the "Tariff/ Towage Contract" is not subject to the Bisso rule because, *inter alia*, the contract is not a traditional towing contract. Third, it has not been determined that the allison was solely caused by the "willful failure" of the WILLIAM S's mate to carry out an order.

WHEREFORE, Defendant/ Cross Claimant Bisso Towboat Co., Inc. respectfully requests that this Honorable Court deny the motion for partial summary judgment.

Respectfully submitted,

/s/ Cindy Galpin Martin
_____
RUFUS C. HARRIS, III (#6638)
ALFRED J. RUFTY, III (#19990)
CINDY GALPIN MARTIN (#25159)
HARRIS & RUFTY, L.L.C.
650 Poydras Street, Suite 2710
New Orleans, Louisiana 70130
Telephone:  (504) 525-7500
Facsimile:   (504) 525-7222
Attorneys for Bisso Towboat Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and forgoing pleading was served on counsel of record by electronic means including the CM/ ECF system this 31st day of October, 2018.

/s/ Cindy G. Martin
_____