1

1            UNITED STATES DISTRICT COURT
2              EASTERN DISTRICT OF LOUISIANA

3

4  JOHN W. STONE OIL              *    CIVIL ACTION
   DISTRIBUTOR, L.L.C., CERTAIN   *    NO. 17-4942 c/w
5  UNDERWRITERS AT LLOYD'S,       *    No. 17-5700
   LONDON, ACE AMERICAN           *
6  INSURANCE COMPANY, and         *    JUDGE SARAH A.
   NATIONAL FIRE & MARINE         *    VANCE
7  INSURANCE COMPANY              *
              Plaintiffs          *    MAG. MICHAEL
8                                 *    B. NORTH
   VERSUS                         *
9                                 *
   PENN MARITIME INC., BISSO      *
10 TOWBOAT CO., INC., TOWING      *
   VESSEL LUCIA, BARGE            *
11 CARIBBEAN, and TOWING VESSEL   *
   WILLIAM S, its tackle,         *
12 furniture, and appurtenances,  *
   in rem Defendants             *
13                                *
   *  *  *  *  *  *  *  *  *  *  * *  *
14

15

16         Deposition of TONY DOUGLAS CUTRER, 39326
   Oak Street, Pearl River, Louisiana, 70452, taken in
17 the offices of Frilot, LLC, Suite 3600, Energy Centre,
   1100 Poydras Street, New Orleans, Louisiana, 70163,
18 commencing at 9:58 a.m., on Thursday, the 7th day of
   June, 2018.

19

20 APPEARANCES:

21

22     PUGH ACCARDO
       (By:  Christopher E. Carey, Esquire)
23     ccarey@pugh-law.com
       112 Innwood Drive
24     Suite B
       Covington, Louisiana  70433
25
               - and -

EXHIBIT
B

135

1   2345, correct?

2        A.     The job started at 2345.

3        Q.     What, in your mind, happens when the job

4   begins?  Obviously, it's not just arriving on site.

5   There must be something else to trigger it.  What is

6   it?

7        A.     I'm sorry.

8        MR. HARRIS:

9               I don't understand that either.

10  EXAMINATION BY MR. LeBLANC:

11       Q.     You have to write a start time for every

12  job in your log.  You're required to do that by the

13  company, right?

14       A.     Yes, sir.

15       Q.     What triggers the start time of a job?

16       A.     When he gives me my first command.

17       Q.     So assuming you arrived there around 2300

18  and at 2345 was your first command -- is that correct?

19       A.     Yes, sir.

20       Q.     -- what did you do while at Perry Street

21  Wharf for those 45 minutes?

22       A.     We grabbed a line on the barge where the

23  guy told us to get.

24       Q.     Anything else in that 45 minutes?

25       A.     No, sir.

136

1      Q.     Did you check out the fendering in
2  that 45 minutes?
3      A.     I cannot see it.
4      Q.     Did you ask anyone about the fendering
5  during that 45 minutes?
6      A.     There wasn't no one on deck.
7      Q.     While at the Perry Street Wharf, when did
8  you ask about the fendering?
9      A.     During the process of putting up the
10 working line, as we was taking the mooring line down
11 and putting up the working line.
12     Q.     But this would have been during the setup
13 period for the job, right?
14     A.     Yes, sir.
15     Q.     At some point between 11:00 and 11:45, some
16 deck crew come out to the barge, right?
17     A.     It was like -- had a 2345 start.  I'm
18 talking it's like just minutes before this.
19     Q.     How many deck crew came out?
20     A.     I'm not sure if it was one or two.
21     Q.     When you arrived between 2300 and 2345, how
22 did you know what was going to be your working
23 channel?
24     A.     The guy on the tug called us.
25     Q.     Said what?

137

1      A.      Said we work Channel 71.

2      Q.      About when was this in terms of your

3   arrival?

4      A.      Excuse me?

5      Q.      When did he tell you that?

6      A.      When I was coming alongside.

7      Q.      Somewhere pretty close to 2300?

8      A.      Yeah.

9      Q.      Did you have any other communication with

10  him at 2300, other than what the working channel was

11  going to be?

12     A.      He told us to get a line on the cleat above

13  the yellow crane and we could hang out there.  And

14  then when the job starts, we could get a working line

15  on the cleat above the yellow crane, the same one that

16  we was moored to.

17     Q.      You moored yourself to that yellow cleat

18  when you first arrived, or your deckhand would've done

19  that?

20     A.      Yes, sir.

21     Q.      Any other initial communications

22  around 2300, other than we're going to work on 71 and

23  tie a line up to that yellow cleat?

24     A.      That was it.

25     Q.      Is the next communication you had with

138

1   anybody from the vessel when the next -- when the two
2   deck crew walked out close to when this operation was
3   going to begin?
4        A.   He called me just before 2345 and said the
5   pilot was coming on board, the captain was coming up.
6   We could take our line in and make fast on the bitt or
7   the cavel cleat that we was moored to just above the
8   yellow crane.
9        Q.   Is that about the same time that the two
10  deck crew came out?
11       A.   Yes, sir.
12       Q.   Did you have any other conversations at
13  that time with the wheelhouse?
14       A.   I asked if they could see how much bow
15  fendering that I had.
16       Q.   All right.  Tell me, as best you can
17  recall, exactly what you asked them.  You just asked,
18  "How much bow fendering do I have?"
19       A.   I asked him if he could get his crew to
20  tell me how much bow fendering I had.
21       Q.   Did the crew tell you how much bow
22  fendering you had?
23       A.   Yes, sir.  He said I had about 18 inches.
24       MR. SIMPSON:
25            Can you say that again?

139

1    THE WITNESS:

2         He told me I had about 18 inches.

3  EXAMINATION BY MR. LeBLANC:

4    Q.    This was all done on Channel 71, over the

5  radio?

6    A.    Yes, sir.

7    Q.    To the best of your knowledge, it was

8  somebody on the deck crew on the barge that told you

9  you had 18 inches of fendering, right?

10   A.    Yes, sir.

11   Q.    Did you respond to the radio call that you

12 had 18 inches of fendering?

13   A.    I believe I told him, "Thank you."

14   Q.    Did you express any concern that, "Hey, I'm

15 worried about having 18 inches?"  Or was it just, "How

16 much do I have?"  "It's 18 inches."  That's what was

17 told to you, right?

18   A.    Yes, sir.

19   Q.    You did not get on the radio back to the

20 deck crew or the wheelhouse of the CARIBBEAN and say,

21 "We've got a problem here.  I've only got 18 inches,"

22 right?

23   A.    I told him that we didn't have a lot of bow

24 fendering.

25   Q.    Told who?

140

1     A.     The -- whoever is in the LUCIA.

2     Q.     When did you tell them this?  Here we are

3 in the sequence.  The deck crew -- you asked how much

4 fendering you have.  The deck crew tells you, "18

5 inches."  You responded, "Thank you."

6     A.     I was talking to the captain.  Actually, I

7 was asking the captain and his guys was talking to

8 him.

9     Q.     You heard his guys saying what the

10 fendering was, right?

11     A.     Yes, sir.

12     Q.     You just told me that the advice of

13 the 18 inches fendering came from somebody on the

14 CARIBBEAN, right?

15     A.     Yes, sir.

16     Q.     You said thank you for that information,

17 right?

18     A.     Yes, sir.

19     Q.     What was next said after you say, "Thank

20 you"?

21     A.     Well, he told us to go half straight in,

22 and we started the job.

23     Q.     That was somebody in the wheelhouse of the

24 LUCIA that would have given you the half straight in?

25     A.     Yes, sir.

141

1    Q.    That would've been presumably around 2345
2  because that was the first order you received?
3    A.    Yes, sir.
4    Q.    All right.  Did you do that?  First of all,
5  did you acknowledge that order?
6    A.    Yes, sir.
7    Q.    How do you acknowledge it usually?  Just
8  repeating it?
9    A.    Yes, sir.  I repeated the order back to
10 him.
11   Q.    Did you then do what he asked you to do?
12   A.    Yes, sir.  I gave him 50 percent.
13   Q.    Other than acknowledging the order, did you
14 tell him anything else?
15   A.    At that particular time, no, sir.
16   Q.    What was the next communication you had
17 after acknowledging the 50 percent straight in?
18   A.    He told me 75 percent.
19   Q.    Did you acknowledge that order?
20   A.    Yes, sir, I did.
21   Q.    Did you comply with that order?
22   A.    No, sir, I didn't.
23   Q.    What did you do?
24   A.    I brought it up to 60 percent.  The barge
25 was holding.  I was worried about my vessel rising up

1     A.    Yes.

2     Q.    After you had the all stop order and then

3 the brief conversation about he might move you and

4 your reply is, "It's up to you," everything was quiet

5 until you got the "hard straight in" order; is that

6 correct?

7     A.    Yes.

8     Q.    Are those the exact words he used, to the

9 best of your knowledge, that is, hard straight in?

10     A.    Yes, sir.

11     Q.    What, as a mate on an assist tug, does

12 "hard straight in" mean?

13     A.    One hundred percent hard, full ahead.

14     Q.    What does "straight in" mean?

15     A.    On the 90.

16     Q.    Did you acknowledge the hard straight in

17 order?

18     A.    Yes, sir, I did.

19     Q.    Let's be clear.  We talked about

20 acknowledging orders a little bit.  When an assist tug

21 acknowledges an order, you're acknowledging to the

22 vessel you're working for that you heard, understood,

23 and are going to carry out the order that was just

24 given; is that correct?

25     MR. HARRIS:

151

1  other.

2      Q.    You don't have any record or log of the

3  time that these orders or radio communications took

4  place, do you?

5      A.    No, sir.

6      Q.    As you sit here today, are you able to give

7  me any time of when the order hard straight in was

8  given?

9      A.    I can't tell you the precise minute or

10 whatever, but it's -- I don't know.

11     Q.    Do you have an approximation?

12     A.    Somewhere between 10 and 15.  I mean, I

13 don't know.

14     Q.    Just tell me what you mean by "10 and 15."

15 Ten minutes after the hour or 15 minutes after the

16 hour?

17     A.    Yes, sir, somewhere in that neighborhood.

18 I don't know exactly.

19     Q.    After he gives you the order hard straight

20 in, what is the next communication you have with the

21 LUCIA?

22     A.    I called him back almost immediately and

23 told him that 40 percent is all I felt comfortable

24 pushing.  My boat had rose up and rolled over to a

25 slight degree.  And I was worried about my bow

152

fendering.  As my boat rolled, I was worried about my
bow fendering jumping over and putting a big slice or
a dent or a hole into the CARIBBEAN.

     Q.    That's a lot.  First, in terms of what you
said, let's just focus on what you said to the LUCIA.
I think you said, "I'm only comfortable giving you
40 percent"?

     A.    Yes, sir.

     Q.    How long after he had given you the order
to go hard straight in did you reply, "I'm only
comfortable giving you 40 percent"?

     A.    It was within several seconds.

     Q.    What is several seconds to you?

     A.    Say, 30 seconds.

     Q.    Within 30 seconds of the order hard
straight in, you respond to the LUCIA, "I'm only
comfortable giving you 40 percent," correct?

     A.    Yes, sir.

     Q.    Prior to the order hard straight in, what
was the position of your engines and throttles?

     A.    I was, like, clutch ahead.

     Q.    Clutch ahead is -- zero to a hundred is
what percentage ahead?

     A.    Ten percent.

     Q.    You were clutch ahead on both engines, I

153

1   assume?

2       A.     Yes, sir.

3       Q.     What about your -- I want to say helm, but

4   I guess that is technically incorrect on a Z-drive.

5   What about your heading?

6       A.     I don't know what the heading was.  I can't

7   control my heading when I'm attached to a vessel like

8   that.

9       Q.     You're just along for the ride at that

10  point?

11      A.     Yes, sir.

12      Q.     You had said something else.  You didn't

13  say this on the radio, but you said you had a concern

14  because you were rolling.  Tell me what was going on

15  with your vessel.

16      A.     All right.  I had 18 inches back here.  As

17  we went up the river, we got into the hard current.

18  When he told me hard straight in, I was trying to come

19  around.  And with that six, seven mile an hour current

20  coming down, with my vessel trying to go up against

21  that, it will roll you over some.

22      Q.     Meaning the current is going to say hit you

23  broadside or --

24      A.     It would --

25      Q.     Let me finish my question.  As you shifted

154

1  from a parallel position to the vessel and tried to

2  come at an angle to her, you become more broadside or

3  abeam to the current, correct?

4       A.    Yes, sir.

5       Q.    What is your concern with that?

6       A.    The boat rolled and lifted up.  As it

7  rolls, your fendering is attached to your vessel.  So

8  when it rolls, you're fendering moves.

9       Q.    Which way did the vessel roll?

10       A.    It rolled to the starboard.  So therefore,

11  the port side lifted up.

12       Q.    It's your testimony the current would have

13  been hitting your starboard side of your vessel at

14  some angle, right?

15       A.    Yes, sir.

16       Q.    You're telling me that that would have

17  caused the starboard side to go down?

18       A.    Yes, sir.

19       Q.    And, consequently, the port side to raise a

20  little bit?

21       A.    Yes, sir.

22       Q.    When the request comes in for -- I'm going

23  to call it a hundred percent rather than hard.  Is

24  that okay?

25       A.    That's fine.

1    Q.    And you said, "I'm only comfortable giving
2 you 40 percent," did you come ahead on the engines
3 to 40 percent and then just stop there or did you
4 consciously say, hey, I'm only going to go to
5 40 percent, but I'm not going to do that until I tell
6 him?

7    A.    I was in the process of going
8 to 100 percent.  When I got to 40 percent, that's when
9 the boat lifted and rolled to the side slightly.

10    Q.    You're gradually increasing the throttles?

11    A.    It's somewhat gradually, but it's pretty
12 fast.

13    Q.    You can go all the way down from zero to a
14 hundred in a second, if you want, right?

15    A.    It takes a couple of seconds for it to pick
16 up.

17    Q.    But the throttle moving only takes a
18 second?

19    A.    Yes, sir.  You don't have no clutches or
20 nothing like that.

21    Q.    When you got the order to go 100 percent,
22 did you put both throttles in the 100 percent
23 position, understanding that it's going to take a
24 little bit of time for the engines to catch up to that
25 throttle control?

156

1       A.      No, sir.  It's almost immediate.  As you're
2   coming ahead, it's picking up the whole time.  When I
3   got to 40 percent, that's when the boat picked up and
4   rolled slightly.
5       Q.      And the word you gave back to the LUCIA
6   within 30 seconds of the order was, "I'm only
7   comfortable giving you 40 percent," correct?
8       A.      Yes, sir.
9       Q.      Did you say anything else at that time?
10      A.      No, sir.  I believe that was it.
11      Q.      What was the next communication?  Did the
12  LUCIA answer you?
13      A.      Let's see.  Anyway, I told him that.  As I
14  told him that, these guys on the barge overheard the
15  conversation.  They come running over there.  And I
16  could hear them talking and they was telling me I had
17  a foot left.
18      Q.      And they said that on the radio?
19      A.      Yes, sir.
20      Q.      How long after you said, "I'm only
21  comfortable giving 40 percent," did the deck crew run
22  over there and tell you that you had 1 foot of
23  fendering?
24      A.      It was just seconds because they was not
25  far from the bow of my vessel.

157

1    Q.    Did you acknowledge -- you believe it was
2  somebody on the deck that made the radio call that
3  said you've got 1 foot of fendering, right?
4    A.    I think so.
5    Q.    Did you acknowledge that radio call that
6  you've got 1 foot of fendering?
7    A.    Me and the LUCIA talked right after that.
8  There kind of like wasn't no real time to, you know,
9  ask him.  So then I said, "Roger.  Roger."  So I
10  reckon that would have been him, but I was talking to
11  the LUCIA.
12    Q.    So let me --
13  MR. HARRIS:
14        Let him finish.
15  THE WITNESS:
16        I said, "Roger.  Roger."  And then I come
17    on ahead on it to a hundred percent.
18  EXAMINATION BY MR. LeBLANC:
19    Q.    After whoever it was that said you have 1
20  foot of fendering, you acknowledged that advice by
21  saying words to the effect of, "Roger.  Roger."  Then
22  you came ahead 100 percent?
23    A.    Yes, sir.
24    Q.    And did you stay full ahead 100 percent
25  after that?

158

1    A.    Yes, sir.  I was hard ahead from that point

2 until we hit down at Stone.

3    Q.    Did you have any other radio communications

4 before the collision occurred after you said -- first

5 of all, when you said, "Roger.  Roger," you never

6 said, "I'm coming ahead full power," did you?  You

7 just said, "Roger.  Roger"; is that correct?

8    A.    Okay.  I'm not sure if I told him I'm

9 coming ahead to 100 percent, but then he come back and

10 asked me if I was pushing hard.  I told him I was

11 pushing hard.  Then he called back again and asked if

12 I was pushing hard, and I told him I was pushing hard.

13    Q.    Let me try to get some timing on that.  You

14 acknowledged the 1 foot of fendering advice by saying,

15 "Roger.  Roger."  Then, sometime later, the LUCIA

16 asked you if you were pushing hard, correct?

17    A.    Yes, sir.

18    Q.    How long after you say, "Roger.  Roger,"

19 acknowledging the 1 foot of fendering, does he ask you

20 if you are pushing hard?

21    A.    I don't know.  It's just --

22    Q.    Pretty tight?  Was it a long time?

23    A.    No.  It's -- I don't know.  Ten seconds.  I

24 don't know.  It wasn't long.

25    Q.    Sure.  A short period of time.  Certainly

159

1  less than 30 seconds?

2      A.    Yes, sir.

3      Q.    Maybe even closer to ten seconds, right?

4      A.    Yeah.  Then he asked me --

5      Q.    Let's take it one step at a time, if we

6  could.

7      MR. HARRIS:

8          I know, but he has to explain.

9      MR. LeBLANC:

10          He can explain.

11      MR. HARRIS:

12          He answered it.  He said he asked again.

13  EXAMINATION BY MR. LeBLANC:

14      Q.    We've got the Roger.  We've got 10 to

15  30 seconds later, at the max, he asked if you're

16  pushing hard.  I assume you respond immediately that

17  you are?

18      A.    Yes, sir.

19      Q.    No time there.  You immediately answer that

20  you are pushing hard.  Then he comes back and asks you

21  again -- right?

22      A.    Yes, sir.

23      Q.    -- if you are pushing hard.  How long after

24  the first question, "Are you pushing hard?" does he

25  ask it again?

160

1     A.    I don't know.  Another -- I don't

2 know -- 20, 30 seconds or something.  I'm not real

3 sure.  Somewhere in that ballpark.

4     Q.    Another 20 to 30 seconds and we get the

5 second, "Are you pushing hard?" question from LUCIA,

6 right?

7     A.    Yes, sir.

8     Q.    Do you respond immediately?

9     A.    Yes, sir.

10     Q.    What do you tell him the second time?

11     A.    "I'm pushing hard."

12     Q.    What is the next radio communication you

13 have after you answer his question for the second

14 time, "Are you pushing hard?"

15     A.    My communication with him?

16     Q.    From him to you or you to him.

17     A.    He talked to his people, but mine with him

18 was, "All stop.  Back hard."

19     Q.    Was that after the collision?

20     A.    Yes, sir.

21     Q.    For now, let's leave after the collision to

22 another discussion.  After you answer his second

23 question, "Are you pushing hard?" and you immediately

24 acknowledge, "Yes, I am," that is all of the radio

25 communications that you have with the LUCIA until

Case 2:17-cv-04942-BWA-MBN   Document 72-3   Filed 11/01/18   Page 20 of 25

1    Q.    So when you go to jobs as an assist tug,
2  you oftentimes don't know what the current on the
3  river is?
4    A.    Correct.
5    Q.    You do know that, on this particular day,
6  the river was very high?
7    A.    Yes, sir.  It was 17 feet in New Orleans.
8    Q.    Do you know, as a mate for Bisso, what a
9  17-foot gauge at Carrollton does to the current?
10    A.    I just told you, it's somewhere between 6
11  and 7 miles an hour.
12    Q.    I know you're saying that now, but you told
13  me that you go to some jobs where you don't know what
14  the current is, right?
15    A.    I also said sometimes our office will tell
16  us.  They tell us to be safe out there.  The river is
17  high.  And they have that conversation.
18    Q.    When you went out --
19    A.    When we go on the boat, the captain tells
20  us to be safe.  The river is high.
21    Q.    Do you discuss specific river conditions
22  and current conditions prior to doing a job or going
23  to a job?
24    A.    No, sir.
25    Q.    On the night of or morning of January 15th,

(504)831-1753                HUFFMAN & ROBINSON, INC.              (800)749-1753
433 METAIRIE ROAD, #220         CERTIFIED COURT REPORTERS         METAIRIE, LA  70005

203

1  before you started working under the direction of the
2  LUCIA on the night of this incident?
3      A.    We had just come out a couple of days prior
4  and they told us.  If you're trying to ask me if I
5  knew that day, somebody told me that day what the
6  current was, no, I did not know.
7      Q.    I'm just asking if you knew the rate of the
8  current in the river before you did this job.  It's a
9  very simple question.
10     A.    I'm not gonna tell you this again.  From my
11  understanding, it was running somewhere between 6 and
12  7 miles an hour.
13     Q.    You told us you learned that afterwards.
14  My question was, did you know at the time you were
15  doing the job what the current was running?
16     A.    I'm sure my office told me.  Okay?
17  MR. HARRIS:
18          You've answered the question.
19  EXAMINATION BY MR. LeBLANC:
20     Q.    And why are you sure that the office told
21  you?
22     A.    Because that's what they do.
23     Q.    Every day?
24     A.    I told you, when we crew change.
25     Q.    When did you come on this vessel?

231

1   Penn Maritime or somebody else, correct?

2       A.    Correct.

3       Q.    I assume that at nighttime, when you are

4   doing some of this work, that they're all looking

5   about the same?

6       MR. LeBLANC:

7             Object to the form.

8   EXAMINATION BY MR. HARRIS:

9       Q.    Is that a reasonable statement?

10      A.    Yes.

11      Q.    Tell me, what are the risks that you're

12  concerned about?  What can happen if there's

13  metal-to-metal contact?

14      A.    Well, I mean, the bow that's pointing right

15  here --

16      Q.    That's on Exhibit No. 3.  It's a pointed

17  bow.  I wouldn't exactly call it a knife edge, but

18  it's fairly pointed.

19      A.    -- that comes up.

20      Q.    Okay.

21      A.    If it jumps up and hits it, it could put a

22  big gash in the side of it.  It could dent it.

23      Q.    Okay.

24      A.    Could make sparks.  I don't know what kind

25  of cargo they're hauling.  It's some sort of tanker.

232

1  If it sparked, it could blow up.  I don't know.

2       Q.    All right.  And I'm going to show you for

3  illustrative purposes on this next attachment, which

4  is Exhibit 13, I'm going to show you a port side view

5  of the CARIBBEAN.

6            (Whereupon, the document is so marked as

7       "Exhibit No. 13" for identification.)

8  EXAMINATION BY MR. HARRIS:

9       Q.    You can see that, right?

10      A.    Yes, sir.

11      Q.    And it appears to me that the barge in this

12 picture, No. 13, is in a loaded condition.  Am I right

13 on that?

14      A.    Yes, sir.

15      Q.    If we looked at a corresponding cleat,

16 which relates to the starboard side cleat that you

17 identified on Exhibit No. 12, why don't you show me

18 where your vessel would have been positioned if it had

19 been secured to the port side.

20      A.    (Indicating.)

21      Q.    Would you circle that for me, please.

22      A.    (Witness complies.)

23      Q.    We can't see the draft marks there.  It is

24 fair to say that she's got a fairly deep draft at this

25 stage in her cargo capacity.  Am I right on that?

234

1       A.    Yes, sir.  It rose and tilted to my

2   starboard side, which would cause my port side

3   fendering to get higher out of the water.

4       Q.    If the fendering gets higher out of the

5   water, that then increases the chance of

6   metal-to-metal contact.  Is that the right physics?

7       A.    Yes, sir.

8       Q.    I have a screen shot from an AIS which

9   shows the positioning of the LUCIA/CARIBBEAN during

10  the turn evolution.  Do you see this?

11      A.    Yes, sir.

12      Q.    I want you to use my pen and just put an

13  arrow to show us when you brought your engine

14  to 40 percent?

15      A.    Can you restate that, please.

16      Q.    Sure.  You testified that the LUCIA gave

17  you an instruction to go a hundred percent, but you

18  were not able to do that because of your fendering

19  concerns, correct?

20      A.    Yes, sir.

21      Q.    And that is when you only felt comfortable

22  in bringing your engines to 40 percent, right?

23      A.    Yes, sir.

24      Q.    What I want to know is, when on this

25  diagram is your best estimate as to when

255

# REPORTER'S CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original required seal on this page.

I, WENDY MAJORIA, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that TONY DOUGLAS CUTRER, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinabove set forth in the foregoing 253 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, as described on the website of the board; that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I am not related to counsel or to the parties hereto, nor am I otherwise interested in the outcome of this matter.

- - - - - - - - - - - - - - - - -

WENDY MAJORIA, CCR
Certified Court Reporter
(No. 84106)
Huffman & Robinson, Inc.
Suite 220, Metairie Office Tower
433 Metairie Road
Metairie, Louisiana  70005
(504) 831-1753/(800) 749-1753
(504) 831-1759/fax