Transcript of the Testimony of
# Henry A. Costner

## Date taken: January 16, 2018

## John W. Stone Oil Distributor, L.L.C., et al v. Penn Maritime, Inc., et al

All electronic deposition & exhibit files
are available at **<<<www.psrdocs.com>>>**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.

**Phone:504-529-5255**
**Fax:504-529-5257**
**Email:reporters@psrdocs.com**
**Internet: http://www.psrdocs.com**

EXHIBIT
C

Henry A. Costner
John W. Stone Oil Distributor, L.L.C., et al v. Penn Maritime, Inc., et al

Page 16

1    Say we're going port side too.  You put the

2    current on the starboard bow with, say, a

3    ten-degree angle to the dock.  You're going to

4    close much faster than if you had it at a

5    five-degree angle.  So in a three-foot river you

6    might even keep a 20-degree angle to try to get

7    it in.  So you just have to watch your heading

8    to the dock and that kind of stuff because the

9    river's going to make you go one way or the

10   other.

11      Q.   What about turning like you did on the

12   morning of this incident?  Does that make it

13   difficult with a 17-foot river?

14      A.   It makes it more difficult, yes.

15      Q.   How so?

16      A.   Same.  You know, the current's going to

17   make you cross the river -- You know, any kind

18   of current makes the vessel go one way or the

19   other so you have to account for it.

20      Q.   Let's talk about the current.  Give me

21   the current speed and your best estimate at this

22   Goldsboro bend or the Algiers ferry landing,

23   wherever you were starting to make the turn.

24   What's the current there?

25      A.   In the neighborhood of close to five

Page 17

1    miles an hour.

2        Q.    You would agree that that's a very

3    significant current?

4        A.    Yes, sir.

5        Q.    And it certainly makes navigation

6    difficult?

7        A.    Yes, sir.

8        Q.    Do you take any added precautions when

9    you're under these circumstances?

10       A.    Yes, sir.

11       Q.    Such as?

12       A.    Going all the way up there and not

13   turning right off the dock.

14       Q.    Okay.  All the way up there, where are

15   we talking about?

16       A.    Up below the ferry landing going up

17   there where you could actually put the boat in

18   less current so when you start to turn, you drop

19   the head into more current which should help you

20   bring it around.

21       Q.    Okay.  And in this particular instance

22   we're talking about "going up there."  We're

23   talking about leaving Perry Street and going up

24   to around the Algiers ferry crossing?

25       A.    Yes, sir.

Henry A. Costner
John W. Stone Oil Distributor, L.L.C., et al v. Penn Maritime, Inc., et al

Page 24

1    you're conning the vessel, you're giving rudder

2    commands and engine order commands, and if

3    you're on a tug and barge, you're the one

4    steering and actually operating it.

5        Q.   Right.

6        A.   So you're the one actually with your

7    hands on the stick and hands on the throttle.

8        Q.   Now, my understanding, on January 15,

9    2016, you were not conning the LUCIA; correct?

10       A.   That is correct.

11       Q.   The mate was conning the vessel;

12   correct?

13       A.   Correct.

14       Q.   In fact, the mate was operating or

15   driving the boat; right?

16       A.   Yes, sir.

17       Q.   Why were you there?

18       A.   They hired us to be there.  We give

19   them navigational advice.

20       Q.   Okay.  What does that mean?

21       A.   You deal with traffic both as far as

22   New Orleans traffic and traffic on the river,

23   that kind of stuff.

24       Q.   Okay.  But despite this navigational

25   advice, the operation of the boat is left up to

Henry A. Costner
John W. Stone Oil Distributor, L.L.C., et al v. Penn Maritime, Inc., et al

Page 25

1    either the mate or the captain; is that true?

2        A.   Yes, sir.

3        Q.   And that was particularly true on

4    January 15, 2016?

5        A.   Yes, sir.

6        Q.   Up until the time and after this

7    collision when you indeed took over the

8    controls; correct?

9        A.   Yes, sir.

10        Q.   What was the watch change aboard the

11   LUCIA on January 15th?  Do you know?

12        A.   What do you mean by "watch change"?

13        Q.   Were they on six-hour changes?

14        A.   I don't know if they were on four,

15   eight, or six hours.  I do not know.

16        Q.   When did you come on board the boat?

17        A.   2330.

18        Q.   And when you came on board, who was on

19   watch?

20        A.   They were both in the wheelhouse.

21        Q.   Okay.  Was anybody else in the

22   wheelhouse?

23        A.   No, sir.

24        Q.   So when you got there, there were only

25   three of you in LUCIA's pilothouse?

1    A.    Okay.  Yes, sir.

2    Q.    Okay.  Was the tug included in the

3  predeparture meeting?

4    A.    No, sir.

5    Q.    And just tell us for the record what

6  was going to happen.  What were y'all doing?  I

7  know you're turning.

8    A.    Right.

9    Q.    Is that all there is to it, just a

10  turn?

11    A.    No.  Well, we were going to go down to

12  Buck Kreihs so, you know, you got to take a

13  long -- You know, the tug was there already when

14  I got on board.  He was just laying alongside

15  with, like, a mooring line.  He wasn't

16  connected.  You know, he didn't have his working

17  line up.

18    Q.    Okay.

19    A.    So we actually talked about the tug,

20  you know, being a, quote, tractor as they call

21  them here, Z-drive-type boat being more

22  maneuverable, and then once they decided Don

23  was -- Noah was going to do the work and Don was

24  up there, Noah contacted the tug to get them to

25  go to 71 and the issue of fendering came up

Page 54

1    then.

2         Q.    Okay.

3         A.    So they sent a deckhand down there to

4    verify that there was fendering.

5         Q.    Okay.  Talk to me about fendering.

6    What is that?

7         A.    That's the section on the bow of this

8    tugboat that protects it from going in

9    metal-to-metal contact with the side of the hull

10   of the barge.

11        Q.    Okay.  I'm going to show you a picture

12   of the WILLIAM S.  We'll attach it as the

13   exhibit next in line.  This is a picture of the

14   WILLIAM S on dry dock.  Do you see this?

15        A.    Yes, sir.  Uh-huh (indicating

16   affirmatively).

17        Q.    And the fendering, you see the

18   fendering on the bow of the boat?

19        A.    Yes, sir.

20        Q.    That's what we're talking about?

21        A.    Yes, sir.

22        Q.    A rubberized substance that surrounds

23   the bow?

24        A.    Yes, sir.

25        Q.    Why is it there?

Page 55

```
 1      A.    To protect it from metal-to-metal

 2  contact.

 3      Q.    What is metal-to-metal contact?

 4      A.    The metal on the tugboat to the metal

 5  on the barge or the ship that it would be

 6  assisting.

 7      Q.    Why do you want it protected?

 8      A.    To keep from damaging it.

 9      Q.    Can metal-to-metal contact be

10  significant?

11      A.    It could be.

12      Q.    And have you ever seen metal-to-metal

13  contact?

14      A.    Not with a barge, no.  Not with a

15  tugboat on the side of the ship, no.

16      Q.    Have you ever seen metal-to-metal

17  contact?

18      A.    Yes.

19      Q.    And it can --

20      A.    It can be significant.

21      Q.    It can be very substantial; correct?

22      A.    It could be.

23      Q.    Costly to repair; correct?

24      A.    Could be.

25      Q.    And when you're dealing with tank
```

Henry A. Costner
John W. Stone Oil Distributor, L.L.C., et al v. Penn Maritime, Inc., et al

Page 56

1    barges, it can trigger explosions; correct?

2        A.   Well, in this particular barge, you've

3    got -- Do you want me to draw this for you too?

4        Q.   Yeah.  What are you going to draw?

5        A.   I'll just draw you the --

6        Q.   We want you to draw it.

7        A.   You see, you're not worrying about

8    explosions so much because if this is the hull

9    and we're looking at it, you know, down, if you

10   cut the hull in half and you're looking straight

11   at it --

12       Q.   You're telling us she's a double-hull

13   vessel?

14       A.   She's a double-hull vessel.  So these

15   are all ballasts --

16       Q.   All right.

17       A.   -- and this is cargo (indicating).

18       Q.   Okay.

19       A.   So if he knocks a hole in this, he's

20   just knocked a hole in the water tank, so to

21   speak.

22       Q.   Okay.  So you're not going to have an

23   explosion?

24       A.   Should not.  Right.

25       Q.   Should not?

Henry A. Costner
John W. Stone Oil Distributor, L.L.C., et al v. Penn Maritime, Inc., et al

Page 57

1      A.    Right.

2      Q.    You hope not?

3      A.    Exactly.

4      Q.    Are you sophisticated enough to know

5    that at times you might have some fumes in the

6    ballast area?

7      A.    Sure.

8      Q.    And you know that fumes in the ballast

9    area and a puncture in the ballast area can lead

10   to bad things?

11     A.    Absolutely.

12     Q.    Okay.  So the bottom line is that you

13   certainly want to avoid metal-to-metal contact;

14   correct?

15     A.    (Witness nods head affirmatively.)

16     Q.    Is that true?

17     A.    Yes, sir.

18     Q.    And you in your experience know this;

19   correct?

20     A.    Sure.

21     Q.    And certainly you want to avoid it;

22   correct?

23     A.    Correct.

24     Q.    So you would certainly think it was

25   prudent of the WILLIAM S to make sure that there

Page 59

1    contact can conceivably lead to significant

2    problems; correct?

3        A.    Sure.

4        Q.    Not only cosmetic damage but

5    substantial damages; true statement?

6        A.    I don't think pushing, no.  Not like

7    that.  You might do some damage.  You're not

8    going to do a lot of internal damage, no.

9        Q.    Have you ever pushed with a

10   4,000-horsepower tug against the side of a boat

11   where there's metal-to-metal contact?

12   MR. LeBLANC:

13           Objection.  Argumentative.

14   EXAMINATION BY MR. HARRIS:

15       Q.    Have you ever done that?

16   MR. LeBLANC:

17           Same objection.

18   THE WITNESS:

19           Have I ever done that?  No.

20   EXAMINATION BY MR. HARRIS:

21       Q.    Okay.  Thank you.  So there was a

22   discussion about the fendering and tell me about

23   that.

24       A.    He was concerned that -- the WILLIAM S

25   was concerned about the fendering so they sent a

Page 60

1    deckhand down there with a flashlight and they

2    decided there was more than three feet of

3    fendering on the side of the hull --

4       Q.   All right.

5       A.   -- that he had three feet or better.

6       Q.   And the concern with the metal-to-metal

7    contact is that when you're pushing on a barge

8    with a low free board, then you have the

9    opportunity with a tug like this to cause

10   metal-to-metal contact; true statement?

11      A.   Sure.  Uh-huh (indicating

12   affirmatively).

13      Q.   Okay.  And just so we all understand

14   each other, the metal to metal that we're

15   talking about is this area below the putting of

16   the fendering system; correct?

17      A.   Yes, sir.

18      Q.   Okay.  Essentially where we are

19   beginning to see the stem of the boat; correct?

20      A.   Yes, sir.

21      Q.   Okay.  So do you know who initiated the

22   concern about the metal to metal?  Was it the

23   deckhand or was it the skipper aboard the

24   WILLIAM S?

25      A.   I'm not a hundred percent sure.   I

Page 69

1      A.   While I was there.  Whether they talked

2   about it before or not, I don't know.

3      Q.   Okay.  But the placement of the line

4   was not made by you; correct?

5      A.   Correct.

6      Q.   Nor was it made by the -- nor the

7   decision on where to place the line made by the

8   tug, the WILLIAM S; correct?

9      A.   Correct.

10      Q.   The tug is following the directions of

11   the man conning the LUCIA; correct?

12      A.   Yes, sir.

13      Q.   And just so we're all clear, your best

14   estimate of where that line was placed on that

15   bitt was approximately 125, 140 feet from the

16   bow?

17      A.   Yes, sir.

18      Q.   Okay.  Why was it placed there, 125

19   feet to 140 feet from the bow of the CARIBBEAN?

20      A.   Why was it placed there?

21      Q.   Yeah.

22      A.   So that he could pull him off the dock.

23      Q.   Okay.  And was it placed there for the

24   turn?

25      A.   It remained there for the turn.  Yes,

Henry A. Costner
John W. Stone Oil Distributor, L.L.C., et al v. Penn Maritime, Inc., et al

Page 86

1    A.   Correct.

2    Q.   But you never heard that order, did

3    you?

4    A.   I did not hear it, no.

5    Q.   Okay.  So without that order, that

6    tugboat is not spooling in and out; fair

7    statement?

8    A.   Yeah.  Fair statement.

9    Q.   All right.  Let's talk about getting

10   off of the dock.  Any issues?

11   A.   No, sir.

12   Q.   Undocking satisfactory; correct?

13   A.   Correct.

14   Q.   Then after the vessel undocked, tell us

15   what then happened --

16   A.   After --

17   Q.   -- in just slow motion.

18   A.   You want me to start at the dock and

19   then go?

20   Q.   Yes.  Perfect.  Thanks.

21   A.   All right.  So we got the line up on

22   the tug so now his first order was half straight

23   in.  So that means when he's telling him

24   straight in, he wants him 90 degrees to the hull

25   pushing straight in.

Page 116

1    be doing these things under these situations,

2    you to be watching and the captain to be there

3    kind of looking and Noah at the sticks?

4        A.    I don't really know what you mean by

5    "commonplace." Does it happen every day?  No.

6    Does it happens sometimes?  Yes.  Sometimes it

7    would just be the captain and you up there.

8    Sometimes it's just you and the captain or you

9    and the mate up there.  So commonplace, no, but

10   when they're both up there, yes, one's doing the

11   work and one's watching what he's doing.

12       Q.    Well, is the captain telling the mate

13   what to do?

14       A.    No.  Not at this stage, no.

15       Q.    Okay.  So what's happening when you've

16   got one-half straight in and backing hard?

17       A.    So all -- you know, all he waits is for

18   him to come around.  I can't remember.  I'm

19   thinking it was three-quarters straight in was

20   the next order and then he starts coming around,

21   and we're probably between -- and I'm going to

22   say head.  So this is -- this is the flow of the

23   river here so we're like this, and about 30 to

24   40 degrees into the turn he's asking him to come

25   up and that's when we get that he's worried

Henry A. Costner
John W. Stone Oil Distributor, L.L.C., et al v. Penn Maritime, Inc., et al

Page 117

1    about, you know, the fendering, metal-to-metal

2    contact and he's only willing to push 40

3    percent.  And whether that be -- I don't know if

4    it's 20 seconds or two minutes but -- Obviously

5    it's not two minutes, but I don't know exactly

6    how long that time elapse was.

7         Q.    You've given me a lot of timing so I

8    don't know what the elapse starts from and ends

9    to.  What do you mean?

10        A.    Well, I'm talking about from the time

11   he gave him the three-quarters to figure out

12   that he was only pushing 40 percent.  I don't

13   know if it was 20 seconds or 30 seconds, 40

14   seconds.  It wasn't two or three minutes, but it

15   was -- you know, there was a delay between

16   giving the order and him telling him that he

17   wasn't comfortable with that and that he was

18   only going to push 40 percent which was already

19   less than the original order.

20        Q.    Well, let me just get this straight.

21   So we've got an order one-half straight in;

22   correct?

23        A.    Correct.

24        Q.    Then that is followed by an order

25   three-quarters straight in; correct?

Page 121

1    command, push three quarters straight in, was

2    his response immediate or was there any kind of

3    delay?"  And your answer was, "No, his response

4    was pretty immediate."  Do you recall giving

5    testimony on the 20th of January, 2016?

6        A.   Reading it -- I read it, yes.  I don't

7    remember saying it, but I read it and I'm sure I

8    did give it, yes.

9        Q.   Okay.  And that was a truthful answer

10   five days after this collision; correct?

11       A.   I would think so.

12       Q.   Okay.  So you would agree that the mate

13   gave an immediate response; correct?

14   MR. LeBLANC:

15            Object to form.

16   EXAMINATION BY MR. HARRIS:

17       Q.   Is that your testimony?  He gave an

18   immediate response?

19       A.   The mate?  You're talking --

20       Q.   Excuse me.

21       A.   -- about the WILLIAM S?

22       Q.   Excuse me.  I'm talking about the

23   WILLIAM S gave an immediate response; correct?

24       A.   That's what it says.

25       Q.   Okay.

Page 122

1      A.   And I'll be honest with you.  I don't

2   remember a hundred percent, no.

3      Q.   But you remembered a hundred percent

4   back on the 21st of January, 2016; correct?

5      A.   That's what I got, yes.

6      Q.   Okay.  And remember the first question

7   I asked you in this testimony, was it true and

8   correct, and you testified that it was; correct?

9      A.   Yes.  Yes.  Best I can remember, yes,

10  it is.

11     Q.   Okay.  So the mate comes back and he

12  says -- Excuse me.

13     A.   The WILLIAM S.

14     Q.   Sorry.

15  MR. HARRIS:

16          Forgive me, guys and gals.  There is a

17  mate aboard the WILLIAM S and that's my silly

18  confusion.

19  EXAMINATION BY MR. HARRIS:

20     Q.   The WILLIAM S comes back with a

21  response, "I can only give you 40 percent";

22  right?

23     A.   Right.  Uh-huh (indicating

24  affirmatively).

25     Q.   And the reason for that was what?

Henry A. Costner
John W. Stone Oil Distributor, L.L.C., et al v. Penn Maritime, Inc., et al

Page 123

1      A.    He said he was worried about riding up.

2      Q.    Okay.  And where was the position of

3   your flotilla at the time?

4      A.    My flotilla as in?

5      Q.    Yeah.

6      A.    I'm not understanding the question.

7      Q.    The position of the CARIBBEAN and the

8   LUCIA at that time.

9      A.    I don't --

10     Q.    Position in the river.

11     A.    Are you talking about the heading to

12   it?

13     Q.    Yes.  Yes.

14     A.    Oh, probably like 30 -- 30 to 45

15   degrees.

16     Q.    Okay.  Now, you mentioned 30 to 40 --

17     A.    Yes.

18     Q.    -- degrees earlier.

19     A.    Okay.  So 30 to 40 degrees is fine

20   then.

21     Q.    And at one point in your testimony you

22   said a third of the way into the turn.  Okay?

23     A.    Okay.

24     Q.    Which 30 to 40 is almost close to a

25   third but --

Page 124

1    A.   Not quite.

2    Q.   -- not quite.

3    A.   If you do 180, it would be 60.  Right.

4    Q.   But we'll accept your testimony today.

5    30 to 40 degrees; right?

6    A.   Yes, sir.

7    Q.   What was the response?  Excuse me.  The

8    heading now was changing, 30 to 40 degrees?  I

9    want to make sure we're clear on this.

10   A.   Right.  The heading is changing.

11   Q.   What is the LUCIA's response to the

12   WILLIAM S response that I'm only going to give

13   you 40 percent?

14   A.   He sent the deckhands down there to

15   look and told the WILLIAM S that he had -- I

16   don't recall exactly -- 18 inches or some amount

17   of fendering, that there wasn't an issue with

18   metal-to-metal contact.

19   Q.   And in the evolution of the turn, if it

20   starts at --

21   A.   Right.  This takes up time.  Exactly.

22   Q.   -- 00:10, where are we in the evolution

23   of the turn because the turn is still being made

24   while the deckhands are checking; right?

25   A.   Correct.

Page 134

1    Cutrere was the mate.  So we've got two mates.

2         MR. RYAN:

3              I understand.

4    EXAMINATION BY MR. HARRIS:

5         Q.   So we're talking now about mate Noah.

6         A.   Okay.

7         Q.   And at some point during the turning

8    evolution he decided to twist.

9         A.   Correct.

10        Q.   And how did that come about?

11        A.   Because we were -- at this stage, you

12   know, we see you're going across so he's just

13   thinking if you can increase the rate of turn

14   some, you might be able to miss those barges,

15   you know.

16        Q.   Tell me about what time this occurred

17   and about where you were in the turning

18   evolution.

19        A.   You know, I would say we were probably

20   almost straight across the river, you know,

21   broadside to the river.

22        Q.   Okay.  So on a 90?

23        A.   To the river.  Yeah.

24        Q.   Yeah.

25        A.   So -- and it probably didn't last 15

Henry A. Costner
John W. Stone Oil Distributor, L.L.C., et al v. Penn Maritime, Inc., et al

Page 137

1    turn --

2         A.    Sure.

3         Q.    -- in three-quarters of a mile;

4    correct?

5         A.    Right.

6         Q.    If you went back, you could have

7    compensated for that in three-quarters of a

8    mile; correct?

9         A.    Yes.

10        Q.    Okay.  And you agreed with the mate's

11   suggestion to twist; correct?

12        A.    Yes.  I did tell him he -- yeah, if he

13   thought it was best.

14        Q.    In hindsight, that was a poor decision;

15   correct?

16   MR. RYAN:

17            Object to form.

18   THE WITNESS:

19            Probably so.

20   EXAMINATION BY MR. HARRIS:

21        Q.    In fact, if you would have continued to

22   back, in all likelihood, you would have not hit

23   barge S-35; correct?

24        A.    That is not correct, no.

25        Q.    Can you say that with any certainty?

Page 142

1    because, like I say, that's going to pick up

2    speed.  You're just trying to lift that stern

3    some and --

4    EXAMINATION BY MR. HARRIS:

5        Q.   But the twist --

6        A.   -- and pick up the rake.

7        Q.   Yeah.  The twisting did not prevent the

8    barge from continuing to move across the river?

9        A.   Did not prevent it, no.

10       Q.   No.  In fact, it accelerated the barge

11   moving across the river because it took away

12   half of the backing power; true statement?

13       A.   I would think it did accelerate.  Sure.

14       Q.   Yeah.  And so the logical answer to my

15   question about didn't the order to twist

16   contribute to the casualty is, in fact, that it

17   did contribute to the casualty; fair statement?

18   MR. RYAN:

19          Objection.

20   THE WITNESS:

21          Yeah.  I don't know.

22   MR. HARRIS:

23          Okay.

24   MR. LeBLANC:

25          Whenever you're at a stopping point,

Page 272

1    CARIBBEAN; fair?

2         A.    Fair.

3         Q.    The wheelman of the WILLIAM S at

4    sometime before the working line was connected

5    expressed some concern about fendering while we

6    were still at the Perry Street wharf; right?

7         A.    While we were still at the Perry Street

8    wharf.  I don't know if it was before he put up

9    the line or as he was putting up the line, you

10   know, to be hundred percent but --

11        Q.    Before any operations began --

12        A.    Before.  Right.  Yes, sir.

13        Q.    -- he asked the question about

14   sufficient fendering?

15        A.    Yes, sir.

16        Q.    And do you recall two deck crew from

17   the LUCIA/CARIBBEAN being out there and going to

18   the specific spot where he was --

19        A.    Yes, sir.

20        Q.    -- facing up to inspect the situation?

21        A.    Yes, sir.

22        Q.    Did you hear over the radio what those

23   two guys told the WILLIAM S about fendering at

24   the dock or at the wharf?

25        A.    Yes, sir.

Page 277

1    this conversation at the wharf with the

2    WILLIAM S about fendering, there was a second

3    conversation out in the river; right?

4        A.   Yes, sir.

5        Q.   That's the one, as you told us a bunch

6    today, took place as the vessel was already into

7    its turn?

8        A.   Yes, sir.

9        Q.   And that's the one that took place with

10   the WILLIAM S, and you've given us your best

11   guess by looking at these diagrams of some times

12   and everything else today; right?

13       A.   Yes, sir.

14       Q.   But when that happened, once the

15   WILLIAM S comes on channel 71 and expresses some

16   concern for the second time, getting around the

17   river now, about fendering, how long did it take

18   for the LUCIA deck crew to get to that spot and

19   check it out again?

20       A.   Fifteen seconds.  Like I say, they're

21   sitting nearby, not far enough that the line, if

22   you were pulling and it parted, it wouldn't

23   break, waiting to turn him loose.

24       Q.   And did you hear them, them being the

25   LUCIA deck crew, after that second inspection 15

Henry A. Costner
John W. Stone Oil Distributor, L.L.C., et al v. Penn Maritime, Inc., et al

Page 304

```
 1              REPORTER'S CERTIFICATE
 2         This certification is valid only for a
      transcript accompanied by my original signature
 3    and original required seal on this page.
 4         I, LYNN DeROCHE SIMMONS, Certified Court
      Reporter in and for the State of Louisiana, as
 5    the officer before whom this testimony was
      taken, do hereby certify that HENRY A. COSTNER,
 6    after having been first duly sworn by me upon
      authority of R.S. 37:2554, did testify as
 7    hereinbefore set forth in the foregoing 303
      pages;
 8         That this testimony was reported by me in
      the stenotype reporting method, was prepared and
 9    transcribed by me or under my personal direction
      and supervision, and is a true and correct
10    transcript to the best of my ability and
      understanding;
11         That the transcript has been prepared in
      compliance with transcript format guidelines
12    required by statute or by rules of the board;
           That I am informed about the complete
13    arrangement, financial or otherwise, with the
      person or entity making arrangements for
14    deposition services; that I have acted in
      compliance with the prohibition on contractual
15    relationships as defined by Louisiana Code of
      Civil Procedure Article 1434 and in rules and
16    advisory opinions of the board; that I have no
      actual knowledge of any prohibited employment or
17    contractual relationship, direct or indirect,
      between a court reporting firm and any party
18    litigant in this matter, nor is there any such
      relationship between myself and a party litigant
19    in this matter;
           That I am not related to counsel or to the
20    parties herein, nor am I otherwise interested in
      the outcome of this matter.
21
22
23
                      _____
24                    LYNN DeROCHE SIMMONS, CCR
                      Certified Court Reporter
25                    State of Louisiana
```