# Transcript of the Testimony of
# Noah T. Blanchard

### Date taken: June 4, 2018

### John W. Stone Oil Distributor, L.L.C., et al v. Penn Maritime, Inc., et al

All electronic deposition & exhibit files are available at <<<www.psrdocs.com>>>.
Please call or e-mail reporters@psrdocs.com if you need a **Username** and **Password**.

# Professional Shorthand Reporters, Inc.
Phone: 504-529-5255
Fax: 504-529-5257
Email: reporters@psrdocs.com
Internet: http://www.psrdocs.com



EXHIBIT D

Noah T. Blanchard
John W. Stone Oil Distributor, L.L.C., et al v. Penn Maritime, Inc., et al

Page 41

1  THE WITNESS:
2       More detailed discussions about the
3  operation prior to getting underway.
4  EXAMINATION BY MR. HARRIS:
5     Q.  Okay. And what do you mean by "more
6  detailed discussions"?
7     A.  Making sure that everybody agrees with
8  the way that something is going to be done and
9  discuss thoroughly before.
10    Q.  Okay. Any other precautions that we
11 haven't talked about?
12 MR. LeBLANC:
13      Object to form.
14 THE WITNESS:
15      Not that I can think of right now.
16 EXAMINATION BY MR. HARRIS:
17    Q.  So let's talk about the extra
18 precautions that you and the vessel that you
19 were manning, the LUCIA, took on January the
20 14th-15th before making this turn. You had
21 extra people in the wheelhouse?
22    A.  Yes.
23    Q.  Who was that?
24    A.  That was Captain Walsh.
25    Q.  Why was he there?

Page 42

1   A.   He was there because high river stage
2   is important to take extra precautions and
3   having him the pilot and myself in the
4   wheelhouse to all discuss and to have extra
5   eyes.  Things happen quicker with high current.
6   Q.   What role did he play during the time
7   this turn started and the time the turn
8   essentially ended or the casualty occurred which
9   was about an 18-minute-or-so period?
10   MR. LeBLANC:
11        Object to form.
12   EXAMINATION BY MR. HARRIS:
13   Q.   What did he do?
14   A.   He was the master so master -- Are you
15   asking what a master does --
16   Q.   No.
17   A.   -- or just --
18   Q.   I'm asking what he did during this
19   approximate 18-minute period as your extra eyes.
20   A.   Okay.  He was part of the discussion
21   prior.
22   Q.   Okay.
23   A.   He gave his advice.  Well, we all
24   agreed on the same thing so there wasn't any --
25   there wasn't much discussion.  It was the pilot

1  gave a suggestion. The captain and I concurred
2  with his suggestion of how we were going to do
3  the operation. The captain was assisting with
4  looking at distances off landmarks, and he was
5  acting as an extra lookout and expert.
6      Q.   Did he ever inject himself and give you
7  any advice during the 18 minutes of this
8  topping-around procedure?
9      A.   We agreed that we would follow the
10 pilot's direction, and the only advice I can
11 probably remember would be him saying you're
12 this far off or -- but he and I concurred with
13 the pilot's directions that were given.
14     Q.   Who was actually conning the LUCIA
15 during this turn evolution?
16     A.   I was at the helm taking directions
17 from the pilot supervised by the master of the
18 vessel.
19     Q.   When you say "directions from the
20 pilot," what do you mean by that?
21     A.   He was instructing me to rudder angles,
22 come ahead, astern, those types of directions,
23 where to go.
24     Q.   He testified that he was there to give
25 you local advice.

1   pilots. You can have incredible inexperienced
2   helmsmen sailing ships in various water.
3   They're taking instructions from the pilot as to
4   rudder and engine commands.
5       Q.  But that was not you in this instance.
6   You were a reasonably experienced chief mate;
7   correct?
8       A.  But I was still taking directions on
9   what to do from the plan that we all had agreed
10  on.
11      Q.  You were the one actually implementing
12  those directions; correct?
13      A.  Yes. The pilot was telling me what to
14  do and I was the one executing the directions.
15      Q.  But not on each and every command
16  though; correct?
17      MR. LeBLANC:
18          Object to the form. What are you
19  talking about? Are you talking --
20  EXAMINATION BY MR. HARRIS:
21      Q.  When you were --
22      MR. LeBLANC:
23          -- about a specific command?
24  EXAMINATION BY MR. HARRIS:
25      Q.  -- giving instructions --

1   that was a good spot.

2   EXAMINATION BY MR. HARRIS:

3      Q.  So Captain Walsh, the pilot, and
4  yourself all said, oh, well, the yellow cleat
5  just ahead of the stern crane was the best spot
6  for this tug?

7      A.  Starboard crane.

8      Q.  I'm sorry.  Starboard crane was the
9  best spot for this tug?

10     A.  Correct.

11     Q.  And why was that the best spot for the
12  tug?

13     A.  It is a balance of being able to top us
14  around effectively but not putting the tug in a
15  too far forward dangerous position.

16     Q.  Okay.  And what does "too far forward"
17  mean?  What do you mean by that?

18     A.  If you have a tug on -- The further
19  forward on the bow you go, the larger risk of
20  damage between the tug and the barge because
21  there's a -- It's called a rake and it's the
22  flare out of the bow and once you start moving
23  ahead further and further, the risk of that.
24  And there's the other risk of -- It becomes more
25  and more difficult the further forward you put a

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge
1-800-536-5255
www.psrdocs.com

Noah T. Blanchard
John W. Stone Oil Distributor, L.L.C., et al v. Penn Maritime, Inc., et al

Page 70

1 evidence.
2     You can answer.
3 THE WITNESS:
4     The deckhand that was getting the line
5 from the WILLIAM S, my deckhand, helped the
6 WILLIAM S look with his flashlight to see how
7 much fendering they had below and instructed him
8 that it should be no issues.
9 EXAMINATION BY MR. HARRIS:
10     Q. Okay.
11     A. And I don't know if he said no issues,
12 but I know he said how much fendering below our
13 decks they had.
14     Q. Okay. So obviously you were aware that
15 he was concerned at that moment when he was
16 pushing against the dock that he thought he
17 might have a fendering issue; correct?
18     A. Yes.
19     Q. Because you sent the deckhand out there
20 to confirm that there was or was not a fendering
21 issue?
22     A. And there was -- After the deckhand
23 told him how much fendering he had below our
24 decks, the WILLIAM S expressed no concern after
25 that.

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge
1-800-536-5255
www.psrdocs.com

Noah T. Blanchard
John W. Stone Oil Distributor, L.L.C., et al v. Penn Maritime, Inc., et al

Page 72

1    A.   He -- He was -- It was requested by the
2  WILLIAM S' mate or captain.  I believe it was
3  asked over the radio, "What is my fendering
4  situation below?"  I'm not sure of the
5  specifics.  And the person that was right there,
6  the best to look at it, was my AB, but it was
7  asked and answered.
8    Q.   Okay.  And there was a second fendering
9  issue; correct?
10   A.   Not -- I'm not aware of a second
11 fendering issue.
12   Q.   Didn't the WILLIAM S express concerns
13 about fendering while you were making the turn?
14   A.   Yes.  A third of the way through the
15 turn the WILLIAM S stated that they were not
16 able to push on a 90 or a hundred percent
17 because they were afraid of riding up.
18   Q.   And you then --
19   A.   Sent --
20   Q.   -- apparently had sent the deckhand --
21 you ordered the deckhand out to see if that was
22 a valid concern; correct?
23   A.   He was concerned that he had -- he
24 didn't have as much fendering below the water
25 line during the turn and that's why he wasn't

Page 73

1  for the first third of the turn pushing a
2  hundred percent.
3      Q.  And my question to you is, you ordered
4  the deckhand to go check to see whether there
5  was adequate fender?
6      A.  Second time.  Correct.
7      Q.  Okay.
8      A.  And he knew what to look for because he
9  had already looked for it the first time.
10     Q.  What was that deckhand's name?
11     A.  Pete Gilrein.
12     Q.  All right.  Back to the beginning of
13 the turn.  Okay?  The evolution of the turn when
14 you're at the dock.  Okay?
15     A.  Okay.
16     Q.  I need to ask you some general
17 questions.
18     A.  And is there a good time to use the
19 restroom?
20     Q.  Any time is a good time.  Okay?
21     A.  Do you mind if I use the restroom?
22     Q.  No, not a bit.
23     A.  I just didn't want to interrupt you
24 when you got into it.
25     Q.  No.  This is a very good time.

1   Q.  Now, before we broke for lunch, I was
2  asking you about engine speeds and we
3  established that at one-third into the turn your
4  engine controls were at clutch ahead.
5   A.  That is to the best of my knowledge.
6   Q.  All right. So I believe at one-third
7  of the turn you at that time were also notified
8  by the assist tug, WILLIAM S, that he was only
9  pushing at 40 percent?
10  A.  At a third of the way through the turn
11  is when the WILLIAM S said they were not
12  pushing -- they were pushing 40 percent, not a
13  hundred percent like asked, and they were not
14  able to get on a 90-degree angle.
15  Q.  Okay. I have a picture here, a
16  diagram.
17  A.  It's right here, seven.
18  Q.  Okay. And you've even marked it in
19  some fashion where it says "informed pushing
20  only 40%" and you've got an arrow drawn to that.
21  Do you see that?
22  A.  Yes.
23  Q.  And is it fair to use that point where
24  you have an arrow as a third into your turn?
25  A.  Yeah. But the arrow's just pointing to

Noah T. Blanchard
John W. Stone Oil Distributor, L.L.C., et al v. Penn Maritime, Inc., et al

Page 180

1   Q.   And you're the only one with that
2   walkie-talkie, right, that is, you and the
3   pilot?
4   A.   Honestly, it was probably -- it could
5   have been somebody else to tell him to go to
6   channel 71.  It was on 67.  So that conversation
7   could have been any of us.  I do not recall who
8   had that discussion.  The chances that I was
9   having the initial conversations with the tug
10  are fairly high, but I'm not going to tell you
11  it was absolutely a hundred percent me the whole
12  time.  I'll say that I was the one having the
13  conversations.  Once we left the dock, that was
14  me.
15  Q.   Okay.  Now, before midnight are you in
16  charge or is somebody else in charge?
17  A.   The captain was on the bridge.  The
18  captain's always in charge.
19  Q.   Okay.  So there's a discussion with the
20  WILLIAM S to go to the starboard side; right?
21  A.   Yes.
22  Q.   And is there a discussion as to where
23  he's going to put his working line?
24  A.   Yes.
25  Q.   And that's where it's going to be just

Page 181

1   forward of the crane on the yellow bitt?
2       A.   Yeah.  Starboard side.
3       Q.   Starboard side.  And he does that?
4       A.   Yes.  And all commands are answered
5   back so this is where we're going to put you and
6   he would say, "Understood" or repeat back the
7   command.
8       Q.   Okay.  Everything good so far?
9       A.   He asked for how much fendering he had
10  below.  This is before -- You know, as the line
11  was getting put up before we officially started
12  him on hire, he asked what the fendering
13  situation was below his -- not his water line
14  but below our barge, and my deckhand assisted
15  him in saying how much he had.  And that was all
16  done via the radio and my deckhand.  I didn't
17  see what he was doing, but I heard it on the
18  radio.
19      Q.   This was before any pushing started?
20      A.   Absolutely.
21      Q.   And the deckhand is Gilchrist?
22      A.   Gilrein.
23      Q.   Gill somebody?
24      A.   Yeah.  Gill somebody.
25      Q.   How do you spell --

1   Q.   Okay.  How much fendering does he have
2   before he approached?
3   A.   Before his line was secure but as he
4   approaches, so he's not touching -- he's
5   hovering or as he's approaching before the line
6   is made up, he asks about fendering, and my
7   deckhand Pete uses his flashlight and was able
8   to confirm to him how much fendering is below
9   our deck.
10  Q.   And did you hear how much?
11  A.   I recall -- To the best of my
12  knowledge, he said between one and a half and
13  two feet.
14  Q.   Okay.  So apparently the WILLIAM S is
15  satisfied and secures to the cleat that we've
16  been talking about; right?
17  A.   Correct.
18  Q.   And then what happens?
19  A.   We tell the WILLIAM S what the plan is,
20  that they're going to hold us to the dock while
21  we get our lines in.  Then we're going to go up
22  towards the reference point of the traffic light
23  on the opposing bank, wait till traffic clears,
24  have them push full on a 90 on a left wheel,
25  which means swinging to port, and go downbound

1   towards the next dock.
2       Q.   Okay.
3       A.   And when the pilot says we are clear to
4   start taking lines in, I tell the WILLIAM S to
5   push at 75 percent straight on to the dock.
6       Q.   And does that happen?
7       A.   Yes.
8       Q.   Okay.  Then what happens?
9       A.   All lines are brought in.
10      Q.   Okay.
11      A.   The pilot is conferring with traffic.
12  Once it is clear, the pilot gives the clear to
13  get the vessel away from the dock.  We have the
14  WILLIAM S go all stop and back us away from the
15  dock and the pilot, Al, directs me to the
16  location that he wants to wait for traffic to
17  clear and where we're going to start our turn.
18      Q.   Okay.  So you proceed upriver a little
19  bit?
20      A.   Yes.
21      Q.   The WILLIAM S still has a working line
22  attached to the cleat that we've been talking
23  about --
24      A.   Yes.
25      Q.   -- that's a little over a hundred feet

Noah T. Blanchard
John W. Stone Oil Distributor, L.L.C., et al v. Penn Maritime, Inc., et al

Page 185

```
1    south of the bow of the CARIBBEAN?
2        A.   Yes.
3        Q.   Okay.  And you wait alongside the east
4    bank?
5        A.   Yes.
6        Q.   And then you're given the all clear?
7        A.   Via Al who is speaking with VTS.
8        Q.   Then what happens?
9        A.   Al tells me to put the rudders hard to
10   port, to tell the assist tug to start our turn
11   and to go clutch ahead on both -- I'm missing a
12   step here.  We've come -- We've come all stop.
13   We're waiting here and we have just a little bit
14   of sternway.
15       Q.   Okay.
16       A.   Then clutch ahead on both engines.
17       Q.   Okay.
18       A.   Full left rudder and then the command
19   to the assist tug is full ahead on a 90.  He
20   repeats the order back to me --
21       Q.   Okay.
22       A.   -- affirming that he understood it.
23   We're watching as the turn starts.  A third of
24   the way through the turn the WILLIAM S gets on
25   the radio and informs us that he is unable to
```

Noah T. Blanchard
John W. Stone Oil Distributor, L.L.C., et al v. Penn Maritime, Inc., et al

Page 186

1   push at a hundred percent.  He's only giving us
2   40 percent and he's not holding a 90, not
3   staying on a 90.  He expressed concern about
4   riding up.
5       Q.   Hold that thought.
6       A.   Yep.
7       Q.   Okay.  You're beginning your turn.
8   You're at clutch ahead full left rudder; right?
9       A.   Yes.
10      Q.   The tug is ordered full ahead at 90?
11      A.   Yes.
12      Q.   And then you say one-third into your
13  turn the tug says he's unable to push and he's
14  not at 90, not able to push at full ahead and
15  he's not at a 90-degree?
16      A.   Correct.
17      Q.   How much time has passed between you
18  going clutch ahead full left rudder and you give
19  the instruction -- Hold on.  Let me --
20      A.   I'm listening.  I'm just --
21      Q.   Let me get the reference point right.
22  And you give the instruction to the tug full
23  ahead at 90?  I want to know how much time
24  elapses between full ahead 90 degrees and the
25  tug then comes back and says he's unable to push

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge
1-800-536-5255
www.psrdocs.com

Noah T. Blanchard
John W. Stone Oil Distributor, L.L.C., et al v. Penn Maritime, Inc., et al

Page 192

1  you ride up or not.  It's not an issue."  And
2  the deckhand during this whole evolution when he
3  started hearing this went over again with his
4  flashlight, looked at it, said, "You've got
5  plenty of rubber," called on the radio and gave
6  a thumbs up to the tugboat that he had plenty of
7  rubber and he was not riding up.
8      Q.  How much time --
9  MR. HARRIS:
10         Hold that question right there, the one
11 immediately preceding that answer.  Just hold
12 it.
13 EXAMINATION BY MR. HARRIS:
14     Q.  How much time elapsed between the tug,
15 WILLIAM S, saying, "I've got a problem here.
16 I'm concerned" and you sent the deckhand out to
17 check it out?
18     A.  I'm going to say around -- between 30
19 seconds and a minute before -- you know, when
20 the deckhand -- because the deckhand is doing
21 other things instead of standing by the tugboat.
22 He was told very quickly, you know, immediately
23 to go look, but he can't just run.  You know,
24 he's not standing by.  He was doing -- looking
25 out for the turn and doing other duties.  When

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge
1-800-536-5255
www.psrdocs.com

1  REPORTER'S CERTIFICATE
2  This certification is valid only for a transcript accompanied by my original signature
3  and original required seal on this page.
4  I, LYNN DeROCHE SIMMONS, Certified Court Reporter in and for the State of Louisiana, as
5  the officer before whom this testimony was taken, do hereby certify that NOAH T. BLANCHARD,
6  after having been first duly sworn by me upon authority of R.S. 37:2554, did testify as
7  hereinbefore set forth in the foregoing 348 pages;
8  That this testimony was reported by me in the stenotype reporting method, was prepared and
9  transcribed by me or under my personal direction and supervision, and is a true and correct
10 transcript to the best of my ability and understanding;
11 That the transcript has been prepared in compliance with transcript format guidelines
12 required by statute or by rules of the board; That I am informed about the complete
13 arrangement, financial or otherwise, with the person or entity making arrangements for
14 deposition services; that I have acted in compliance with the prohibition on contractual
15 relationships as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and
16 advisory opinions of the board; that I have no actual knowledge of any prohibited employment or
17 contractual relationship, direct or indirect, between a court reporting firm and any party
18 litigant in this matter, nor is there any such relationship between myself and a party litigant
19 in this matter; That I am not related to counsel or to the
20 parties herein, nor am I otherwise interested in the outcome of this matter.
21
22
23
24                        LYNN DeROCHE SIMMONS, CCR
                          Certified Court Reporter
25                        State of Louisiana

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge
1-800-536-5255
www.psrdocs.com