UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| JOHN W. STONE OIL DISTRIBUTOR, L.L.C., *et al.* | CIVIL ACTION |
|---|---|
| VERSUS | NO. 17-4942 c/w 17-5700<br>***applies to both actions*** |
| PENN MARITIME, INC., *et. al.* | SECTION: M (5) |

## ORDER & REASONS

Before the Court is a Motion for Partial Summary Judgment[1] filed by defendant, Penn Maritime, Inc. ("Penn"), seeking dismissal of the cross-claim filed by co-defendant Bisso Towboat Co., Inc. ("Bisso") for contractual defense and indemnity. Bisso opposed the motion.[2] Penn filed a reply in support of the motion,[3] to which Bisso responded with a surreply in opposition to the motion.[4] Having considered the parties' memoranda and the applicable law, the Court issues this Order & Reasons.

**I.    BACKGROUND**

This litigation arises out of a January 15, 2016 maritime accident that occurred on the Mississippi River. However, the relevant facts concerning the business relationship between Bisso and Penn, which is a wholly-owned subsidiary of Kirby Offshore Marine ("Kirby") (collectively, "Kirby/Penn"), predate the accident.

In 2013, Charles Ferrer ("Ferrer") of Kirby/Penn contacted Scott Slatten ("Slatten"), Bisso's president, to request a meeting to discuss the companies' entering into a business relationship whereby Bisso would provide towing services to Kirby/Penn's articulated-tug-and-

---
[1] R. Doc. 63.  Unless otherwise noted, the documents referenced are from Civil Action No. 17-4942.
[2] R. Doc. 72.
[3] R. Doc. 77.
[4] R. Doc. 82.

barge units ("ATBs") operating on the Mississippi River.[5] On May 8, 2013, Slatten met with Ferrer at Kirby's office in Houston, Texas, to discuss rates and terms, including Bisso's standard terms and conditions, also known as its "Tariff."[6] Slatten states in his affidavit that the rates set forth in the Tariff are a starting point for negotiations, and those rates apply in the absence of another negotiated agreement.[7] Slatten and Ferrer negotiated a rate of $550 per hour.[8] On May 10, 2013, Bisso's tugs began assisting Kirby/Penn's ATBs on the relevant portion of the Mississippi River, and Bisso has been Kirby/Penn's exclusive provider of tug services in that area ever since.[9]

On February 11, 2014, Slatten again met with Ferrer at Kirby's office in Houston to discuss the general business relationship between the companies.[10] Thereafter, on June 14, 2014, Ferrer agreed by email to a rate increase to $825 per hour for Bisso tugs working with Kirby/Penn's ATBs on the Empire/Ostrica stretch of the Mississippi River, while the rate remained $550 per hour for other areas of the river.[11] Slatten and Ferrer had another meeting on September 23, 2014, to discuss the business relationship between the companies.[12]

On February 26, 2015, Slatten sent an email to Bisso's customers, including Kirby/Penn through Ferrer and William Block ("Block"), who also worked for Kirby, advising them that Bisso would soon send a new Tariff with increased rates.[13] Slatten followed up on March 19, 2015, by

---

[5] R. Doc. 72-2 at 1-2. In its reply memorandum, R. Doc. 77 at 2-4, Penn asks the Court not to consider Slatten's affidavit, arguing that it is a "sham affidavit," because some of the statements therein differ slightly from Slatten's later-obtained deposition testimony. The "sham affidavit" doctrine does not apply since the affidavit in question here actually preceded the deposition. Moreover, the deposition testimony does not necessarily contradict the affidavit so much as explain it. Hence, the Court will consider Slatten's affidavit as a whole, but give deference to the deposition testimony, to the extent that there are material discrepancies.
[6] R. Doc. 72-2 at 1.
[7] *Id.* at 2.
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*

2

sending an email to Kirby/Penn, again through Ferrer and Block, and Bisso's other customers, informing them of an approaching rate increase and Bisso's new Tariff, which were set to become effective on April 1, 2015.[14] A copy of the Tariff, along with the incorporated Towage Contract and Rates, Terms and Conditions (collectively, "Tariff/Towage Contract") was attached to the email.[15] Penn does not dispute that Kirby/Penn received a copy of the Tariff/Towage Contract. The Tariff/Towage Contract contained, among others, the following Terms and Conditions:

> These "Terms and Conditions" shall apply to all ship assist towing, escort towing and general towing or tug services on the Mississippi River for which no other express written contract signed by Bisso, or any applicable Tariff of a terminal or elevator facility in favor of Bisso exists. The ordering of any services provided by Bisso or the acceptance of any services provided by Bisso or on behalf of Bisso, constitutes acceptance to all of the "Terms and Conditions" and provisions stated herein and posted on Bisso Towboat's website www.bissotwoing.com at the time such services are ordered, verbally requested, or performed. Updates to theses "Terms and Conditions" may be made from time to time by posting updates to www.bissotowning.com.
>
> The person or entity requesting or ordering the tug services warrants that it has full authority to bind the vessel to be assisted, and its Owners and Operators (and charterers, if any) or the Owner, to the Rates, Terms and Conditions and all provisions contained in this Tariff/Towage Contract, and shall indemnify, defend and hold harmless Bisso … from and against all costs, expenses, liabilities and damages of any nature whatsoever, including reasonable attorney's fees and costs, incurred and sustained in defending against any such liability or in enforcing this paragraph in consequence of such person or entity lacking such authority.
>
> \*     \*     \*
>
> … (3) Bisso … shall not be liable for any losses or damages of any nature whatsoever, injury, or death sustained by any person or entity arising out of or occurring while such services are being rendered or incident thereto, so long as the assisting tugs follow and carry out the orders and directions of the master and/or pilot of the assisted vessel, unless such losses or damages are proven to have been caused solely by the willful failure of the assisting tug's captain or crew members to carry out such directions and orders of the assisted vessel, and (4) Owners and the assisted vessel, its owners, operators, charterers and insurers shall defend, indemnify and hold harmless Bisso … from and against any and all claims, demands, suits, costs, expenses, liabilities and damages of any nature whatsoever

---

[14] *Id.* at 2-3.
[15] *Id.* at 3.

(including reasonable attorney's fees and costs incurred by Bisso) and from any cause whatsoever, including negligence of the assisting tug, its captains and crew members, except to the extent such losses or damages are caused solely by the willful failure of the assisting tug's captain or crew members to carry out the directions and orders of the assisted vessel as provided in subpart (3), resulting from or connected with damage, injury or death of any person or entity (including third parties), arising out of or occurring while such tug services are being rendered.[16]

The Tariff/Towage Contract provides spaces for both Bisso and the customer to sign.[17] Neither Bisso nor Kirby/Penn signed the document.[18] Penn contends that it never agreed to the Terms and Conditions of Bisso's Tariff/Towage Contract.[19]

After he sent the March 19, 2015 email, Slatten negotiated rates with Bisso's customers, using the Tariff as a starting point.[20] Slatten states in his affidavit, and he testified at his deposition, that he met with Ferrer on May 5, 2015, and gave him a copy of Bisso's new Tariff/Towage Contract.[21] According to Slatten, Ferrer acknowledged that he had already received the documents via email.[22] Slatten contends that, at that meeting, Ferrer agreed to increase the rate to $600 per hour, but requested that the new rate not go into effect until June 1, 2015.[23] At his deposition, Slatten testified that he and Ferrer did not specifically discuss the Terms and Conditions of the Tariff/Towage Contract; thus, Ferrer never expressly agreed to nor expressly disavowed such Terms and Conditions.[24]

Slatten further states in his affidavit that he met with Ferrer and Block on October 13, 2015, in Houston, and neither of them expressed any concern about the Tariff/Towage Contract.[25] Bisso

---

[16] R. Doc. 63-4 at 3-4.
[17] *Id.* at 1.
[18] R. Doc. 63-2 at 2.
[19] *Id.*
[20] R. Doc. 72-2 at 3.
[21] *Id.*; R. Doc. 77-1 at 10.
[22] R. Doc. 72-2 at 3.
[23] *Id.*
[24] R. Doc. 77-1 at 10.
[25] R. Doc. 72-2 at 3.

and Kirby/Penn's business relationship continues to this day, with Bisso providing assistance to Kirby/Penn's vessels approximately 50 times per month.[26]

On January 15, 2016, during the existence of Bisso and Kirby/Penn's business relationship, the M/V *Lucia* and T/B *Caribbean*, which were both owned and operated by Penn, were mated as an articulated-tug-and-barge unit ("ATB *Lucia/Caribbean*"), and operating on the Mississippi River.[27] The ATB *Lucia/Caribbean* needed to turn around from an upriver direction at approximately mile 96.6 in order to proceed downriver to its destination.[28] Federal pilot Al Kostner boarded the M/V *Lucia*, and Bisso was contacted to provide a vessel to assist with the maneuver.[29] The M/V *William S*, a towboat that was owned and operated by Bisso, arrived at the scene.[30] The *William S*'s mate, Tony Cutrer ("Cutrer"), was at the helm of the vessel while it assisted the ATB *Lucia/Caribbean* with the turnaround.[31] During the maneuver, the bow of the T/B *Caribbean* allided with a barge that was moored to a dock owned by plaintiff John W. Stone Oil Distributor, L.L.C. ("JWS Oil").[32]

On May 15, 2017, JWS Oil and its insurers (collectively, "Plaintiffs") filed Civil Action No. 17-4942 against Penn and Bisso, *in personam*, and the vessels, *in rem*, alleging claims under the general maritime law for negligence and unseaworthiness, and seeking compensation for the property damage JWS Oil sustained as a result of the allision.[33] On June 9, 2017, JWS Oil, on behalf of itself and its underwriters, filed Civil Action No. 17-5700 against Penn, Bisso, and Kirby

---

[26] *Id.*
[27] R. Doc. 1 at 5.
[28] R. Doc. 63-1 at 2.
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *See* R. Doc. 1.

Corporation ("Kirby Corp."),[34] *in personam*, and the vessels, *in rem*, alleging claims under the general maritime law for negligence and unseaworthiness, and seeking compensation for the property damage JWS Oil sustained, and for amounts JWS Oil and its insurers expended to mitigate potential pollution, all as a result of the allision.[35] The lawsuits were consolidated because they concern claims arising from the same maritime accident.[36]

Thereafter, Bisso answered both complaints and filed cross-claims against Penn and Kirby Corp. for defense and indemnity pursuant to the Terms and Conditions of the Tariff/Towage Contract.[37] Penn answered Bisso's cross-claim, denying the existence of the contract and that it was obligated to defend and indemnify Bisso against Plaintiffs' claims.[38]

Penn filed a cross-claim against Bisso alleging that the allision was solely the fault of the *William S*, because its crew willfully failed to follow the directions of the M/V *Lucia*'s captain.[39] Penn also alleges that Bisso owes it indemnity and/or contribution under the general maritime law because Bisso was at fault for any damages Plaintiffs may have sustained as a result of the accident.[40] Further, Penn asserts a claim against Bisso for damages to the ATB *Lucia/Caribbean*.[41]

## II. PENDING MOTION

Penn filed the instant motion for partial summary judgment seeking dismissal of Bisso's cross-claim against it for contractual defense and indemnity.[42] Penn argues that it did not ratify the Tariff/Towage Contract that contains the defense-and-indemnity provision; the defense-and-

---

[34] JWS Oil and its underwriters voluntarily dismissed their claims against Kirby Corp. pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure. R. Doc. 23.
[35] *See* R. Doc. 1, Civil Action No. 17-5700.
[36] R. Doc. 6, Civil Action No. 17-5700.
[37] R. Doc. 14 at 2-3 & R. Doc. 15 at 2-3.
[38] R. Doc. 18 at 1-3.
[39] *Id.* at 4.
[40] *Id.* at 4-5.
[41] *Id.* at 5.
[42] R. Doc. 63.

indemnity provision is voided due to Bisso's failure to follow the instructions of the captain of the M/V *Lucia* during the maneuver that led to the allision; and the defense-and-indemnity provision is void under the "*Bisso* rule" announced by the Supreme Court in *Bisso v. Inland Waterways Corp.*, 349 U.S. 85 (1955).[43]

## III. LAW & ANALYSIS

### a. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Id*. A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id*. at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id*. at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996). The substantive

---

[43] R. Doc. 63-1 at 1. Penn also argues that Bisso's Tariff/Towage Contract is not a mandatory "tariff" because it is not filed with the appropriate governmental agencies. R. Doc. 63-1 at 11-12. Bisso acknowledges that it does not contend that the Tariff/Towage Contract was the type of mandatory tariff that needs to be registered; rather, Bisso used the term "tariff" to refer to its "schedule of rates, terms, and conditions," as it says is common in the industry. R. Doc. 72 at 11-12. This is the meaning the Court will ascribe to Bisso's use of the term.

law identifies which facts are material. *Id.* Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Equal Emp't Opportunity Comm'n v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014). "[U]nsubstantiated assertions," "conclusory allegations," and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary judgment motion, a court may not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, __, 134 S. Ct. 1861, 1866 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). Nor must the court consider uncited evidence in the record. Fed. R. Civ. P. 56(c)(3).

After the movant demonstrates the absence of a genuine dispute, the nonmovant must articulate specific facts and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A) & (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point

to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

   b. **The "*Bisso* Rule"[44]**

Penn argues that the indemnity provision in the Tariff/Towage Contract is void as a matter of public policy pursuant to the "*Bisso* rule."[45] In *Bisso v. Inland Waterways Corp.*, 349 U.S. 85 (1955), the Supreme Court considered "whether a towboat may validly contract against ***all*** liability for its own negligent towage." *Id.* at 85 (emphasis added). The Bisso towboat involved in that case, the *Cairo*, was in the Mississippi River towing an oil barge that "had no motive power, steering apparatus, officers or crew, [and] its movements [were] being completely controlled by the *Cairo*." *Id.* at 86. The *Cairo* collided with a bridge pier and sank as a result of negligent towage on the part of those operating the *Cairo*. *Id.* Bisso's towage contract contained clauses that relieved Bisso "from liability for its negligence." *Id.* The Supreme Court held that towers cannot "contract wholly to escape liability for their own negligent towing." *Id.* at 94. The purpose of the rule is "(1) to discourage negligence by making wrongdoers pay damages, and (2) to protect those in need of goods and services from being overreached by others who have power to drive hard bargains[,]" because "vessels in American ports [need to] be able to obtain towage free of monopolistic compulsions." *Id.* at 91.

In applying the "*Bisso* rule," the Fifth Circuit considers whether the exculpatory clause at issue shelters a party "from *all* liability," as did the clause at issue in *Bisso*, and invalidates those

---

[44] The Court considers Penn's arguments regarding the application of the "*Bisso* rule" first because, if the indemnity provision is void as a matter of public policy, it is irrelevant whether Penn agreed to it.
[45] R. Doc. 63-1 at 19-23.

9

that do. *Int'l Shipbreaking Ltd. LLC v. Smith*, 44 F. App'x 653, at *4 (5th Cir. June 11, 2002) (emphasis in original). On the other hand, the Fifth Circuit upholds exculpatory provisions in which a party retains "sufficient exposure to liability to deter negligence." *Id.* (citing *Todd Shipyards Corp. v. Turbine Serv. Inc.*, 674 F.2d 401, 410 (5th Cir. 1982) (upholding red letter clause limiting defendant's liability for negligence and breach of contract to $300,000)).

The exculpatory clause in Bisso's current Tariff/Towage Contract does not attempt to insulate Bisso from all liability for its own negligence. To the contrary, it states that Bisso is relieved from liability only if a Bisso captain and crew are following the orders of the master and/or pilot of the vessel being assisted by the tug, and that Bisso is not relieved from liability if the losses or damages are caused solely by the Bisso captain's or crew members' willful failure to carry out the directions or orders of the assisted vessel's master and/or pilot.[46] Thus, the exculpatory clause protects Bisso if its captain and crew are following orders given by personnel on the assisted tug (*i.e.*, not making the decisions for themselves), and places liability back on Bisso if its captain or crew willfully fails to follow those orders and causes an accident. In the case at bar, Bisso was not the dominate party because the captain of Penn's vessel was giving the orders for Bisso's crew to follow. Indeed, there is a dispute about whether Cutrer willfully failed to follow the orders given by the captain of the Penn vessel, and whether that alleged failure caused the allision.

Further, on the record before the Court, it appears that the towage contract was not adhesionary and the parties had equal bargaining power. Slatten stated in his affidavit that there are other towing operators on the relevant stretch of the Mississippi River, and Kirby/Penn is free to use the services of these other companies.[47] Moreover, Kirby/Penn's bargaining power is

---

[46] R. Doc. 63-4 at 3-4.
[47] R. Doc. 72-2 at 2.

evidenced by the fact that it negotiated a lower rate for Bisso's services for this job than the standard rate stated on the Tariff.[48]

The facts of this case are markedly different than the scenario that existed in Bisso. There, the towboat was towing an unmanned barge and the Supreme Court found that the contract was adhesionary. Here, the Bisso towboat was assisting a vessel that was moving on its own power, and was taking orders from the captain of that vessel. Further, the contract here is not adhesionary because the parties had equal bargaining power and Kirby/Penn had the choice of other services. Therefore, the "*Bisso* rule" is inapplicable, and Penn's motion for partial summary judgment that the defense-and-indemnity clause is void as against public policy is DENIED.

### c. Existence of a Contract between Penn and Bisso

Penn argues that it never agreed to the Terms and Conditions stated in Bisso's Tariff/Towage Contract because it never signed the document, its legal department never approved the contract, and the contract is not on file with Kirby/Penn.[49] Penn also argues that the parties' course of dealing does not establish that Penn assented to the Terms and Conditions of the Tariff/Towage Contract because the contract was presented to Kirby/Penn only twice – once in an email, and then handed to Ferrer by Slatten – and was not part of the parties' common understanding regarding their business relationship.[50] Penn contends that Bisso simply proposed a contract and Penn never agreed nor objected to the terms stated therein, which is insufficient to prove a meeting of the minds.[51]

"As a general rule, admiralty law applies to all maritime contracts," including towing contracts. 1 THOMAS J. SCHOENBAUM, ADMIRALTY & MAR. LAW § 5:1 (6th ed. 2018) (citing *Aqua*

---

[48] *Id.* at 3.
[49] R. Doc. 63-1 at 12-17 & R. Doc. 77 at 5.
[50] R. Doc. 63-1 at 17-18 & R. Doc. 77 at 5.
[51] R. Doc. 77 at 5.

*Marine Constructors, Inc. v. Banks*, 110 F.3d 663, 670 (9th Cir. 1997)). The general maritime law "is the product of the maritime jurisprudence of the federal courts" and "'is an amalgam of traditional common law rules, modifications of those rules, and newly created rules'" that are "'drawn from state and federal sources.'" *Id.* (quoting *E. River Steamship Corp. v. Transam. Delaval, Inc.*, 476 U.S. 858, 864-65 (1986)). Applying federal law in the context of maritime contracts "includes looking to 'principles of general contract law' that can be found in treatises or restatements of the law." *Int'l Marine, L.L.C. v. FDT, L.L.C.*, 619 F. App'x 342, 349 (5th Cir. Aug. 10, 2015) (citing *Univ. of Tex. Sys. v. United States*, 759 F.3d 437, 443 (5th Cir. 2014) (quoting *Franconia Assocs. v. United States,* 536 U.S. 129, 141-42 (2002))).

The general rules of contract law apply to the formation of towage contracts. 2 SCHOENBAUM, *supra*, § 12:2. "[O]ral contracts are generally regarded as valid by maritime law." *Kossick v. United Fruit Co.*, 365 U.S. 731, 734 (1961). Further, because the statutes of frauds do not apply to towage contracts, there is no requirement that a towage contract be in writing; "in fact many towage contracts are oral." 2 SCHOENBAUM, *supra*, § 12:2.

A contract is formed when at least two parties with the legal capacity to contract manifest mutual assent to a bargained-for exchange of consideration. RESTATEMENT (SECOND) OF CONTRACTS §§ 9, 12, 18 & 71 (2018). Neither Penn nor Bisso dispute that they had the capacity to contract for the towage services, and they both concede that they had an oral agreement as to the price that Penn would pay for Bisso's services. Penn disputes only whether that oral contract included its assent to the Terms and Conditions of Bisso's Tariff/Towage Contract.

The "[m]anifestation of mutual assent to an exchange ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party." *Id.* § 22. "Acceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited

or required by the offer," which can include acceptance by performance that operates as a return promise. *Id.* § 50. However, "[a] manifestation of mutual assent may be made even though neither offer nor acceptance can be identified and even though the moment of formation cannot be determined." *Id*. § 22. Assent may be given in writing, orally, by the performance of other acts, or by the failure to act. *Id.* § 19. A party's conduct is effective as a manifestation of his assent if "he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." *Id.* Further, the parties' course of dealing gives meaning to or supplements their agreement by "establishing a common basis of understanding for interpreting their expressions and other conduct." *Id.* § 223.

In construing maritime contracts, the Fifth Circuit has examined the parties' course of dealing and held that standardized provisions can become a part of contracts between the parties when the parties have a substantial history of business dealings. *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 265 (5th Cir. 2011) (citing *Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1120 (5th Cir. 1992)). In *One Beacon*, Crowley Marine Services, Inc. ("Crowley"), a vessel owner, hired Tubal-Cain Marine Services, Inc. ("Tubal-Cain"), a ship repairer, to perform work on one of its vessels. *Id.* at 261. Crowley's port engineer met with Tubal-Cain's president to discuss the repair work, which commenced shortly thereafter. *Id.* at 263. Crowley had contracted with Tubal-Cain for vessel repair work eight times the preceding year, and then fifteen additional times following the job at issue in the case. *Id.* For each project, Crowley sent Tubal-Cain a repair service order ("RSO") that stated the scope of the repairs, but did not include pricing information and was not signed by either party. *Id.* Each RSO stated that, unless another written agreement applied, the RSO was "issued in accordance with the purchase

13

order terms and conditions" found on Crowley's website. *Id.* Crowley's terms and conditions included a defense-and-indemnity provision. *Id.*

An employee of a Tubal-Cain subcontractor was injured while working on Crowley's vessel. *Id.* at 261. Crowley demanded defense and indemnity from Tubal-Cain in accordance with its standard terms and conditions. *Id.* Tubal-Cain rejected the request, contending that the parties had an oral agreement as to the price for the work, but that Crowley's terms and conditions were not a part of that agreement because the RSO was sent to Tubal-Cain after the work began and Tubal-Cain did not have the opportunity to review and assent to the terms. *Id*. at 264-65. Neither party disputed that Crowley did not specifically discuss the terms and conditions with Tubal-Cain, nor did Crowley furnish Tubal-Cain with a hard copy of those provisions. *Id.* at 264.

Applying the general maritime law of contracts, and examining the parties' course of dealing, the Fifth Circuit held that Crowley's terms and conditions, which were available on its website and referenced in the RSOs, were part of the contract between Crowley and Tubal-Cain. *Id.* at 270. The court noted that the RSOs put Tubal-Cain on notice of the terms and conditions, which were reasonably accessible on Crowley's website, "and Tubal-Cain manifested assent by accepting the RSOs without objection to the terms and conditions." *Id.* Thus, the court held that Tubal-Cain was bound by Crowley's terms and conditions even if nobody at the company ever read them. *Id.*

This case is analogous to *One Beacon*. On Penn's motion for summary judgment, this Court must assess the evidence in the light most favorable to the party opposing summary judgment.[52] Here, Kirby/Penn and Bisso have a course of dealing that dates back to 2013. Kirby/Penn has ordered tugs from Bisso multiple times per month for at least five years. In 2015,

---

[52] On summary judgment, doubtful matters are not resolved in favor of the judgment seeker. At a bench trial, though, a court is no longer encumbered by this standard of review.

Bisso's president gave Kirby/Penn's employees, on two occasions, Bisso's Tariff/Towage Contract. Although the parties negotiated a different rate for Bisso's services than the one reflected on the Tariff, and neither party signed a copy of the document, Kirby/Penn never objected to Bisso's Terms and Conditions and was on notice of their existence. Bisso's Tariff/Towage Contract, of which Kirby/Penn had at least two copies, specifically states that Bisso's Terms and Conditions "apply to all ship assist towing, escort towing and general towing or tug services on the Mississippi River for which no other express written contract signed by Bisso … exists," and that the ordering or acceptance of any services provided by Bisso constitutes the acceptance of Bisso's Terms and Conditions.[53] Further, Bisso's Terms and Conditions are readily available on its website under a tab clearly marked "Tariff." The factual question is whether this puts anyone ordering Bisso tugs on notice that it will be subject to Bisso's Terms and Conditions. Bisso insists that it did, arguing that, although Bisso's invoices to Kirby/Penn did not reference its Terms and Conditions, Kirby/Penn, through its long and frequent course of dealing with Bisso, was certainly aware of such Terms and Conditions. At this summary judgment stage, the Court is obligated to see the evidence this way.[54] Thus, Kirby/Penn may well have bound itself to Bisso's Terms and Conditions by virtue of its course of dealing in ordering tugs from Bisso. As such, Kirby/Penn's motion for partial summary judgment that it is not bound by Bisso's Terms and Conditions is DENIED.

   **d. Failure to follow instructions**

Penn argues that Bisso is not entitled to be excused from liability under the terms of the exculpatory and defense-and-indemnity clauses because Cutrer failed to follow the directions of

---

[53] R. Doc. 63-4 at 3-4.
[54] And the Court may continue to see it that way after a bench trial, but does not intend by this ruling to prejudge this matter.

the M/V *Lucia*'s captain.[55] Cutrer admitted at his deposition that twice during the maneuver he failed to follow the instructions given by the M/V *Lucia*'s captain.[56] Cutrer testified that the M/V *Lucia*'s captain instructed him to push against the T/B *Caribbean* at 75% power, but Cutrer provided 60% power instead, without informing the instructing captain of his actions.[57] Cutrer also testified that the M/V *Lucia*'s captain instructed him to push "hard straight in" (*i.e.*, 100% power at a 90-degree angle), when the ATB *Lucia/Caribbean* was commencing its turn in the middle of the river, but he decided to push at 40% power instead.[58] However, Cutrer also testified that he did not think that the orders of the M/V *Lucia*'s captain were safe for him to perform.[59] Under a summary judgment standard, the evidence that Cutrer failed to perform certain orders given by the M/V *Lucia*'s captain is insufficient to demonstrate beyond dispute that his failure was willful, and that any such "willful failure" was indisputably the sole cause of the allision so as to invalidate the exculpatory and defense-and-indemnity clauses. Thus, Penn's motion for partial summary judgment that Cutrer's actions voided the defense-and-indemnity provision is DENIED.

## IV. CONCLUSION

Accordingly, IT IS ORDERED that Penn's motion for partial summary judgment (R. Doc. 63) is DENIED.

New Orleans, Louisiana, this 16th day of November, 2018.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE

---

[55] R. Doc. 63-1 at
[56] R. Doc. 63-5 at 2-5.
[57] *Id.* at 2-3.
[58] *Id.* at 5.
[59] R. Doc. 72-3 at 8-16.